UNITED STATES of America, Appellee,

v.

Dennis BONFIGLIO, Appellant.

No. 889, Docket 82–1359.

United States Court of Appeals,
Second Circuit.

Argued Feb. 22, 1983.

Decided July 25, 1983.

Arnold E. Wallach, New York City, for appellant.

James B. Rather, Asst. U.S. Atty., S.D. N.Y., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y., Roanne L. Mann, Asst. U.S. Atty., New York City, of counsel), for appellee.

Before PIERCE, WINTER and PRATT, Circuit Judges.

PIERCE, Circuit Judge:

Dennis Bonfiglio appeals from a judgment of conviction of the United States District Court for the Southern District of New York, Inzer B. Wyatt, Judge, entered on October 12, 1982, on the ground that the court erred in denying appellant's motion to suppress a tape cassette which recorded a conversation in which he participated. The issues presented on appeal are: (1) whether the tape cassette was lawfully seized; (2) once seized, whether a special agent of the Bureau of Alcohol, Tobacco, and Firearms (ATF)[1] could properly play the cassette without first obtaining a separate search warrant. For the reasons set forth below, we hold that both the seizure of the tape cassette and the playing of it without a separate search warrant were lawful. Therefore, we affirm Judge Wyatt's denial of appellant's motion to suppress.

## I. *Facts*

On January 19, 1981, ATF Special Agent John James Enright submitted an affidavit in support of an application for a search warrant to the United States District Court for the Southern District of New York. Agent Enright sought a warrant which would permit him to search a house occupied by defendant-appellant Dennis Bonfiglio in Sullivan County, New York, which he stated he believed to contain "an AR–15 rifle, serial number SP575–99 received from Mulvey's Marine and Sport Shop in violation of Title 18, U.S.C., Section 922(h)." Agent Enright's affidavit set forth various facts to support his belief that the rifle had been obtained by Bonfiglio earlier that day from Mulvey's and was taken by him to his

1. The Bureau of Alcohol, Tobacco and Firearms is a division of the United States Department of the Treasury.

Sullivan County residence. The affidavit also asserted that Bonfiglio was then under indictment, and that Bonfiglio's receipt of such a firearm would violate 18 U.S.C. § 922(h)(1), which makes it unlawful for any person under indictment for a crime punishable by imprisonment for a term exceeding one year to receive any firearm which has been transported in interstate commerce.

The following facts were elicited at a hearing on Bonfiglio's motion to suppress. At approximately 5:30 p.m. on January 19, 1981, Judge Vincent L. Broderick of the United States District Court for the Southern District of New York issued a search warrant upon Agent Enright's application and supporting affidavit. The warrant authorized a search of Bonfiglio's residence in Sullivan County, New York, for the "AR–15 rifle, Serial Number SP57599."

At approximately 6:00 p.m. that same day, ATF Agent Fleming was informed by Agent MacDonald that the search warrant had been issued, whereupon he and Agents Bartley, MacDonald, Muldoon, and Rossero proceeded to Bonfiglio's residence. With the permission of Bonfiglio's wife, Agents Fleming, MacDonald, and Bartley entered the house at approximately 6:25 p.m. and, after initially looking for Bonfiglio and not finding him, they began to search for the subject rifle. At approximately 7:10 p.m., Agent Bartley found Bonfiglio hiding behind a partition of insulation in the second floor attic. Approximately one hour later, Agent Fleming found an ammunition magazine for an AR–15 rifle in a bedroom closet on the main floor. At that time, Bonfiglio confirmed that the ammunition was for an AR–15, and told Agent Fleming that he had an AR–15 at a friend's house in Westchester County.

Soon thereafter, Agent Enright arrived at the appellant's house with the search warrant, displayed the warrant and explained its purpose to Bonfiglio and his wife. At approximately 8:30 p.m., Agent Fleming was lifting a plywood floorboard in the second floor attic in Bonfiglio's presence when Bonfiglio rushed over, reached under the lifted floorboard, and removed an AR–15 rifle covered with two brown paper bags. The rifle matched the one described in the warrant. As Bonfiglio was removing the AR–15 rifle, Agent Fleming saw a blue revolver beneath the same plywood floorboard. Agent MacDonald took the rifle from Bonfiglio and Bonfiglio went to the attic door and removed several more firearms from the ceiling between some sheetrock and insulation. As he removed these firearms, he stated that they were his personal hunting guns, that they were all legal, and that there were no other firearms in the house.

After Bonfiglio left the room, Agent Fleming returned to the plywood floorboard under which he had previously seen the blue revolver. He lifted up the floorboard and saw, in addition to the revolver, which was in a transparent plastic bag, two other handguns also in transparent plastic bags, a tear-gas grenade, and a fourth transparent plastic bag containing a variety of items. On inspection by Agent Fleming, the fourth plastic bag was found to contain two New York state drivers' licenses in names other than Bonfiglio's, a birth certificate not in his name, a baptismal certificate with a seal but no name, a plastic social security card facsimile not in his name, an identification card with a picture of someone other than Bonfiglio and in a name other than his, a confidential automobile key code book,[2] a memo book containing names and addresses, some of which were recognized as the names of known or suspected criminals including a suspect in an arson investigation, a confidential roster of the Yonkers Police Department containing names, addresses, and home phone numbers of police officers, and a small manila envelope marked "Tap on Ben Bon Hoft." Inside this envelope the agent found a tape cassette marked "Ben."

At approximately 9:00 p.m., the agents terminated the search. On the back of the warrant, Agent Enright listed on the return

---

2. Agent Fleming testified that he believed such key code books are used to obtain keys from locksmiths for various automobiles.

the items seized; he told Bonfiglio and his wife the items which were being taken; and he left a copy of the warrant and the return with them. The agents then departed with the rifles, handguns, and contents of the fourth plastic bag including the tape cassette. Agent Fleming retained the items until the next morning.

On January 20, 1981, Agent Fleming checked the serial numbers on the rifles and guns and found that four of them were stolen. He also played the tape cassette, which he found to be a recording of a conversation between Bonfiglio and another male, later identified as Benedict Dix, Bonfiglio's co-defendant herein. The conversation concerned various criminal activities including acts of arson.

A five count indictment against Bonfiglio, Dix and others was filed on June 4, 1982. Count One charged that Bonfiglio, Dix and others conspired to maliciously damage, by means of explosives, buildings and other real and personal property in violation of 18 U.S.C. § 371 (1976). Counts Two and Three charged Bonfiglio and Dix with the malicious destruction of two delicatessens by means of explosives in violation of 18 U.S.C.A. § 844(i) and (j) (1976 & West Supp.1983). Counts Four and Five applied only to defendant Dix.

On July 7, 1982, Bonfiglio moved to suppress "all the evidence in the case" pursuant to Rule 41, Fed.R.Crim.P., and the Fourth, Fifth, and Ninth Amendments to the Federal Constitution. The affidavit of Bonfiglio's attorney in support of the motion mainly addressed the alleged illegality of the search and seizure of the cassette. In particular, the appellant claimed that the seizure of the tape as well as the playing of it were "not within the scope of the warrant" that had been issued and thus were "presumptively void."

A suppression hearing was held on July 21, 1982. Judge Wyatt found that the tape cassette had been discovered in plain view by the agents while they were lawfully searching the premises pursuant to a valid search warrant, and that no additional warrant was required to play the cassette. Therefore, he denied Bonfiglio's motion to suppress in its entirety.

On August 12, 1982, Bonfiglio entered a guilty plea to Counts One and Three of the indictment and reserved the right to appeal the ruling on the suppression motion.[3] On October 12, 1982, Judge Wyatt sentenced Bonfiglio to concurrent terms of three years imprisonment to be served consecutively to a term of imprisonment imposed by Judge Broderick for unrelated firearms offenses.

## II. Seizure of the Tape

The first issue presented on this appeal is whether the seizure of the tape by the ATF agents at Bonfiglio's residence violated his Fourth Amendment rights. Bonfiglio presents a number of arguments to support his claim that such rights were violated. He first notes that the search warrant that had been issued referred to only a single rifle and did not mention the tape cassette. He also contends that he had a "great expectation of privacy" with respect to the tape, since it was in a manila envelope concealed under a floorboard in the attic of his home. Thus, he argues, the tape cassette was not in "open view." Moreover, even though the inscription on the envelope referred to a "tap," he argues that this does not necessarily denote criminality since consensual wiretapping is legal. Thus, he asserts that the agents did not know at the time they seized the tape whether it was contraband, evidence of a crime, or neither.

The warrant requirement of the Fourth Amendment protects the individual's right to privacy and society's interest in reasonable security and freedom from surveillance in that it severely limits an officer's right to thrust himself into an individual's home. *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–69, 92 L.Ed. 436 (1948). The protection afforded by the Fourth Amendment, however, must be balanced against society's interest in controlling crime. Accordingly, although a search conducted without a warrant is "*per*

**3.** Bonfiglio's co-defendant, Dix, had pleaded guilty to Counts One and Five and was sentenced to a term of two years imprisonment followed by five years probation. Dix did not appeal.

*se* unreasonable ... [it is] subject ... to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *See Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971).

■ One such exception which has been well established by the courts is the "plain view" doctrine. Under this doctrine, the police may seize evidence in plain view without a warrant in certain limited circumstances.[4] The Supreme Court has set forth three conditions which must be met before the plain view doctrine may be applied. First, the initial police intrusion must be lawful, such as where the police have a warrant to search a given area for specified objects, and in the course of the search discover other incriminating articles. *Coolidge,* 403 U.S. at 466, 91 S.Ct. at 2038; *see also Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969) (search incident to lawful arrest); *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968) (police inadvertently discover incriminating object, although not conducting search); *Warden v. Hayden,* 387 U.S. 294, 298–300, 87 S.Ct. 1642, 1645–1646, 18 L.Ed.2d 782 (1967) (hot pursuit). Second, the discovery of the evidence in plain view must be inadvertent. *Coolidge,* 403 U.S. at 465–66, 91 S.Ct. at 2037–38; *Mapp v. Warden,* 531 F.2d 1167, 1172 (2d Cir.), *cert. denied,* 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976). Third, it must be "immediately apparent to the police that they have evidence before them," *Coolidge,* 403 U.S. at 466, 91 S.Ct. at 2038, in order to prevent extension of the scope of the search to a general exploration.

In the instant case, we believe that the district court correctly held that the initial seizure of the tape cassette was lawful under the plain view doctrine. The district court carefully and properly analyzed the seizure of the cassette in light of the three

*Coolidge* requirements, and found that each requirement was satisfied.

■ First, the court found that the officers were on the premises to make a lawful search pursuant to a valid search warrant. Moreover, in initially looking under the floorboard they saw the rifle which was the object of the search, and a handgun; when they went back to the floorboard to get the handgun, the district court found, they saw in plain view the plastic bag containing the inscribed envelope which, in turn, contained the subject cassette. Second, no argument is made by Bonfiglio that the discovery of the cassette was anything but inadvertent. Third, the district court found that it was reasonable for the agents to believe the envelope inscribed with "Tap on Ben Bon Hoft" contained evidence of a crime, since non-consensual wiretapping is illegal under federal law. 18 U.S.C. § 2511 (1976 & Supp. II 1978). Appellant contends that this condition was not met since consensual wiretapping is legal. However, it is not a prerequisite for a legal seizure under the plain view doctrine that at the time of the search the officers know with certainty that the seized item is evidence of a crime. *United States v. Canestri,* 518 F.2d 269, 275 (2d Cir.1975). Moreover, the district court observed that the context in which the cassette was found, located under a floorboard along with a rifle, handguns, and other suspicious items, supported an inference that it was evidence of a crime.

Thus, the district court did not clearly err in finding that the seizure of the tape was justified under the plain view doctrine.

### III. *Playing the Tape*

Appellant next argues that even if it is assumed that the tape cassette was lawfully seized, his Fourth Amendment rights were, nonetheless, violated by the agent's playing of the tape without a warrant. Citing *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), appellant con-

---

**4.** As the Supreme Court stated in *Coolidge,* "it is important to keep in mind that, in the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the 'plain view' doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal." 403 U.S. at 465, 91 S.Ct. at 2037.

tends that listening to the tape without a warrant was, in effect, an investigatory search which violated his expectation of privacy. Once the tape had been seized and was within the control of the agents, he asserts, there was no danger that it would be destroyed. Moreover, the tape was held overnight before it was played. Thus, it is contended that the agents should have obtained a warrant before playing the tape. Further, appellant contends that under *United States v. Taborda,* 635 F.2d 131 (2d Cir.1980), a warrant must be obtained to use a device or instrument to augment the human senses, here a tape recorder, to aid in conducting a search. Finally, appellant contends that his First Amendment rights were infringed by the warrantless playing of the tape.

As a·preliminary matter, we note that when items have been lawfully seized, a separate warrant is required to conduct a search thereof if the individual has a high expectation of privacy in the item seized. *Compare United States v. Chadwick,* 433 U.S.·1, 13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977) (separate warrant required to open and search contents of lawfully seized footlocker, in which individual had high expectation of privacy), *with Chambers v. Maroney,* 399 U.S. 42, 49–51, 90 S.Ct. 1975, 1980–1981, 26 L.Ed.2d 419 (1970) (no separate warrant required to search lawfully seized car, in which individual had diminished expectation of privacy). Here, the notation on the envelope "Tap on Ben Bon Hoft," under the circumstances which occurred herein, had the practical effect of putting the contents of the tape in plain view and therefore reducing the expectation of privacy. *See United States v. Martino,* 664 F.2d 860, 874 (2d Cir.1981), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982) (contents of bag in plain view since bag in plain view and defendant told police what was in bag; statements demonstrate a reduced expectation of privacy); *United States v. Candella,* 469 F.2d 173, 175 (2d Cir.1972) (guns in container in defendant's house were in plain view since container was in plain view and defendant told police that guns were in con-

tainer). Thus, once the cassette was lawfully seized by ATF agents, given the written revelation of its content, Bonfiglio no longer had a "reasonable expectation of privacy sufficient to justify independent constitutional protection" of the recorded statement. *Martino,* 664 F.2d at 874.

We conclude that here, unlike *Chadwick,* Bonfiglio's expectation of privacy with respect to the recorded statements was insufficient to justify separate constitutional protection first for the search and then, separately, for the seizure. The district court did not err, but correctly held that once the tape was lawfully in the possession of the agents, "they had a right to play it and were not required to get a separate search warrant."

We also reject appellant's contention that the search was unlawful because a tape recording device was used to augment the human senses. As with the search itself, the lawfulness of using a device to aid the human senses in conducting a search is dependent on the individual's reasonable expectation of privacy. For instance, in *Taborda,* 635 F.2d at 138–39, this court held that Taborda's right to privacy was infringed when government agents used a telescope to look into his house and the objects seen through the telescope could not have been seen unenhanced. However, it was not the enhancement of the senses *per se* that was held unlawful in *Taborda,* but the warrantless invasion of the right to privacy in the home.

In contrast, the warrantless use of supplemental resources including mechanical devices, such as binoculars, to observe activities outside the home has been consistently approved by the courts. *United States v. Lace,* 669 F.2d 46, 50–51 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982); *see also Coolidge,* 403 U.S. at 446, 448, 91 S.Ct. at 2027, 2028 (chemical tests on clothing); *United States v. Waltzer,* 682 F.2d 370, 373 (2d Cir.1982) (drug-sniffing dog); *United States v.*

*Ocampo,* 650 F.2d 421, 427 (2d Cir.1981) (flashlight); *United States v. Pugh,* 566 F.2d 626, 627 n.2 (8th Cir.1977) (same), *cert. denied,* 435 U.S. 1010, 98 S.Ct. 1885, 56 L.Ed.2d 397 (1978); *United States v. Bronstein,* 521 F.2d 459, 461 (2d Cir.1975) (drug-sniffing dog), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976).

Here, Bonfiglio's reduced expectation of privacy in the contents of the lawfully seized tape, as evidenced by his labeling of the envelope in which it was contained, justified the use of the tape recording device by the agents to augment the human senses. Thus, we reject Bonfiglio's contention that the use of the device constituted a violation of the Fourth Amendment.

■ Finally, Bonfiglio contends that his First Amendment rights were infringed by the warrantless playing of the tape because the tape was a recording of protected speech. We find this argument to be without merit since the tape was not played for the purpose of determining whether the statements recorded thereon constituted protected speech.

The Supreme Court addressed the issue of whether a warrantless search was violative of the First Amendment in *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980). In *Walter,* certain films had been seized by police following a call from a private party to whom the films had mistakenly been delivered. The police, without first obtaining a warrant, used a projector to view the films for the purpose of determining whether they constituted obscene materials. Thus, the alleged crime which the films evidenced involved speech, which, if not obscene, would likely have been protected by the First Amendment. In a close decision, in which no opinion received a majority vote, the Court held that the viewing of the films without a warrant was a violation of Walter's First Amendment rights. The Court noted that in situations in which materials are arguably protected by the First Amendment and

the basis for seizure is disapproval of the message therein, the warrant requirement must be observed with "scrupulous exactitude," to ensure that protected speech is not infringed, citing *Stanford v. Texas,* 379 U.S. 476, 484–85, 85 S.Ct. 506, 511–12, 13 L.Ed.2d 431 (1965); *see Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 326 n. 5, 99 S.Ct. 2319, 2324 n. 5, 60 L.Ed.2d 920 (1979) ("[W]e have recognized special constraints upon searches for and seizures of material arguably protected by the First Amendment; materials normally may not be seized on the basis of alleged obscenity without a warrant." (citations omitted)).

Here, the alleged crime which the tapes evidenced was, in the first instance, an illegal wiretap, and, once the tapes were heard, arson. Neither of these crimes involved the First Amendment or prior restraint of First Amendment activities, as did the alleged violation in *Walter.* Unlike *Walter,* there is no evidence or reason to believe that the tape herein was intended for distribution to anyone. Thus, *Walter's* discussion of the First Amendment is inapplicable to this case.

■ *Walter* is distinguishable on Fourth Amendment grounds as well. One distinction rests on the fact that where the First Amendment is implicated, as it was in *Walter,* the application of the Fourth Amendment differs from situations in which no First Amendment issues are involved. For instance, in *Roaden v. Kentucky,* 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973), the Supreme Court held that the warrantless seizure of an allegedly obscene film, contemporaneously with and as an incident to a lawful arrest of the theater manager for the public exhibition of such material, was a violation of the Fourth (and Fourteenth) Amendments. This is so even though a well established exception to the warrant requirement is the seizure of items incident to a lawful arrest. *See Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The *Roaden* court explained that:

the seizure [of the film] is unreasonable, not simply because it would have been easy to secure a warrant, but rather because prior restraint of the right of expression, whether by books or films, calls for a higher hurdle in the evaluation of reasonableness.

413 U.S. at 504, 93 S.Ct. at 2801.

 Furthermore, where the First Amendment is implicated, more stringent limitations on obtaining and executing a search warrant consistently with the Fourth Amendment are imposed. In *Stanford,* 379 U.S. at 485, 85 S.Ct. at 511, the Court held that a heightened degree of specificity in a search warrant's description of "things to be seized" is required where the subject materials "are books, and the basis for their seizure is the ideas which they contain." In contrast, where the "special problems associated with the First Amendment are not involved, as they are not here, more 'reasonable particularity' is permissible." *Berger v. New York,* 388 U.S. 41, 98, 87 S.Ct. 1873, 1904, 18 L.Ed.2d 1040 (1967) (Harlan, J., dissenting) (citations omitted).

 Another distinction between *Walter* and the instant case on Fourth Amendment grounds relates to the role of a private party in the initial search. In *Walter,* the subject goods were initially examined by private parties, while here, the tape was initially examined by government agents acting under a warrant. It seems settled that a wrongful search or seizure by a private party does not violate the Fourth Amendment or deprive the government of the right to use evidence it has lawfully obtained from a private party. *Walter,* 447 U.S. at 656–57, 100 S.Ct. at 2401–02. Justice Stevens' opinion in *Walter* stated that "the Government may not exceed the scope of the private search unless it has the right to make an independent search." *Id.* at 657, 100 S.Ct. at 2402. Since the private party had not actually viewed the films, the Court held that "[t]he projection of the films was a significant expansion of the search that had been conducted previously by a private party and therefore must be characterized as a separate search." *Id.* This is because the private search did not entirely frustrate the defendant's expectation of privacy. Thus, the private search "did not ... strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection." *Id.* at 659, 100 S.Ct. at 2403.

Here, there was no initial search by a private party. Rather, the initial search was conducted by government agents who possessed a warrant. Thus, no issue is presented herein of exceeding the scope of a private party's initial search. The fact that a warrant was secured initially has further significance. Where government agents come into possession of materials as a consequence of a private party's search, there has been no independent determination at any point by a "neutral and detached magistrate," *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948), and any further search is solely at the will of "the officer engaged in the often competitive enterprise of ferreting out crime." *Id.* In the instant case, probable cause for the search had been demonstrated and a warrant had issued. The danger of an agent being carried away by excessive zeal is thus considerably diminished. We see no reason, therefore, to read *Walter* expansively and apply it to the facts presented here.

For all the reasons set forth above, we affirm the decision of the district court.