**UNITED STATES of America, Appellee,**

v.

**Ariel George FALCON and Robert Paul Jordan, Defendants-Appellants.**

**Nos. 84–2176, 84–2230.**

United States Court of Appeals, Tenth Circuit.

July 11, 1985.

---

Michael P. Carey, Denver, Colo., for defendant-appellant Falcon.

Jeffrey R. Edelman, Denver, Colo., for defendant-appellant Jordan.

Patrick T. Murphy, Asst. U.S. Atty., Denver, Colo. (Robert N. Miller, U.S. Atty., Denver, Colo., with him on the brief), for appellee.

Before HOLLOWAY, Chief Judge, and LOGAN and TIMBERS *, Circuit Judges.

---

* Honorable William H. Timbers of the United States Court of Appeals for the Second Circuit, sitting by designation.

TIMBERS, Circuit Judge.

Appellants Falcon and Jordan appeal from judgments of conviction entered August 20, 1984 after a jury trial in the United States District Court for the District of Colorado, Sherman G. Finesilver, Chief District Judge. Both appellants were convicted of attempting to collect an extension of credit by extortionate means in violation of 18 U.S.C. § 894 (1982) (Count I); of travelling in interstate commerce with the intent to commit a crime of violence in violation of the Travel Act, 18 U.S.C. § 1952 (1982) (Count II); and of conspiring to commit an offense against the United States in violation of 18 U.S.C. § 371 (1982) (Count III). The conspiracy count was premised on the substantive offenses specified in Count II. Appellants each were sentenced to three and a half years imprisonment on Count I and to two years imprisonment on each of Counts II and III. All of the sentences were ordered to run concurrently. Appellants have commenced serving their sentences of imprisonment.

Appellants raise numerous claims of error on this appeal. We hold that none has merit. We find that the principal claim of error is appellant Falcon's claim that a consent search by FBI agents at his brother's apartment and the seizure of certain evidence that was admitted against Falcon at his trial violated the Fourth Amendment. We shall focus in this opinion principally on that claim, as counsel did at oral argument. We also have reviewed carefully both appellants' other claims of error, to which reference will be made briefly in this opinion.

I.

We shall summarize only those facts believed necessary to an understanding of our rulings on the legal issues presented on this appeal.

The events leading to the indictment, trial and conviction of these appellants began in the spring of 1982. At that time, Dr.

Patricia Stranahan was a partner with Dr. Michael Roark in a medical practice at Thornton, Colorado. The two also were co-investors in a multi-million dollar medical complex. Roark, however, withdrew his financing upon the advice of his accountant and refused to go through with the deal. This angered Stranahan. She confronted Roark and insisted upon his fulfillment of their agreement. When Roark continued to refuse, Stranahan mortgaged her husband's farm land for $150,000 to provide the additional necessary financing. The project collapsed nevertheless. In the spring of 1983, Stranahan commenced a civil action against Roark. In July of 1983, Stranahan attempted to force Roark into involuntary bankruptcy based on a dispute over the dissolution of their medical partnership and the distribution of its assets. Unknown to Stranahan and her husband, Bruce Richardson, Roark left Colorado on April 2, 1984 and obtained employment at Mercy Hospital in Buffalo, New York.

Stranahan and Richardson believed that Roark had cheated them and caused the loss of their investment in the complex. Richardson, who was a former leader of a motorcycle gang in Colorado, sought assistance in the collection of this perceived "debt". By letter postmarked April 5, 1984, Richardson contacted Robert L. Konitski, who operated out of a post office box in Rockford, Illinois. Konitski had advertised in *Soldier of Fortune* magazine under the name Delta Enterprises. The advertisement represented that Delta Enterprises was an international "collection agency" capable of performing any type of collection.

Richardson told Konitski that a large sum of money had been taken from his wife under false pretenses. He wanted Konitski to recover it. Konitski and Richardson entered into two contracts. The first required Konitski to collect $185,000 from Roark. The second called for a similar collection of $173,000 from Joe Debreceni, who had been the developer of the now-defunct medical complex. Konitski was to receive 40% of the collected funds, less expenses.

Delta Enterprises, which operated out of the Rockford post office box referred to above, had no employees other than Konitski. To recruit assistance in the performance of his contracts with Richardson, Konitski placed another ad in *Soldier of Fortune*. Appellant Falcon, who was unemployed and lived in Bridgeport, Connecticut, mailed a resume to Konitski in response to the ad. Konitski called Falcon and informed him that, if successful, he would be paid $6000 for picking up a certain individual and forcing him to sign some documents. Konitski told Falcon that the job could include breaking and entering and the planting of electronic surveillance devices.

Konitski told Falcon to meet him in Denver, Colorado, and to bring a handgun, a pair of handcuffs and a blackjack. Konitski also told Falcon that he would teach him how to use chloroform to subdue the victim. In response to a question by Falcon, Konitski explained that the handgun could be brought on the airplane by packing it in his luggage.

Konitski received appellant Jordan's resume from a firm in New Hampshire called Northwest Investigations, although Jordan lived in Attleboro, Massachusetts. On April 16, 1984, Konitski called Jordan and offered to pay him $5000 if the collection was successful. As with Falcon, Konitski told Jordan to meet him in Denver where an individual would be picked up and forced to sign documents and that Jordan should bring a handgun and handcuffs.

Konitski then purchased airline tickets for himself, Falcon and Jordan. Konitski arranged and paid for hotel rooms and rental cars in Denver. Falcon flew from Connecticut and Jordan flew from Providence, Rhode Island to Denver.

On April 21, 1984, Konitski met Jordan and Falcon at their hotel in Northglenn, Colorado. Konitski knew that the plan from the beginning was to kidnap Roark. Richardson supplied detailed physical descriptions of Roark and Debreceni, a description of their residences, two blank

quitclaim deeds and two blank promissory notes. Richardson also purchased electronic surveillance equipment. Other equipment and weapons had been brought to Colorado by Falcon and Jordan. Richardson and Stranahan provided appellants and Konitski with a tape recording on which Richardson and Stranahan explained the source of the dispute with Roark and Debreceni and detailed the points at which the victims were believed to be vulnerable, including the names of Roark's wife and son and the address of his father.

Appellants first were assigned to search courthouse records at Denver for property owned by Roark and by Debreceni. Falcon obtained a copy of a deed of trust with Roark's signature on it. A sample of Roark's signature was believed necessary for later comparison with that on the documents he would be forced to sign.

Appellants then began a surveillance of Roark's residence, not knowing that he had left Colorado for New York. On April 23, they followed an individual they believed was Roark but lost him in downtown Denver. Roark testified that he had returned to Denver from New York in late April for a long weekend.

Stranahan finally informed appellants that she believed Roark had left Colorado to work in Buffalo. On April 30, appellants left Denver for Buffalo where hotel reservations had been made for them by Richardson. Appellants travelled first from Denver to Bridgeport to pick up more equipment and to enlist Michael Rattley, an acquaintance of Falcon, to assist in the kidnapping.

Falcon, Jordan and Rattley met in Buffalo on May 5. They spotted Roark at Mercy Hospital on May 7 and followed him to his hotel. Konitski arrived in Buffalo the next day. On May 9, appellants and Rattley returned to Roark's hotel in a van. They lured Roark from his room by telling him that they had run into his car. Roark then was grabbed from behind, a gun was put to his head and he was forced into the back of the van. Roark was handcuffed, blindfolded and gagged by Falcon. Falcon and Jordan carried guns. Rattley was unarmed.

Roark was then driven into a vacant warehouse. Jordan unsuccessfully attempted to contact Konitski. The van left the warehouse looking for Konitski, who by that time had been joined by Richardson. The two groups finally met in the parking lot of Konitski's hotel.

The blindfold was improperly placed on Roark so that he was able to see Jordan leave the van in the parking lot and return with a manila folder. The van then departed from the parking lot and was driven to a construction site, followed by Konitski and Richardson. The acts, conduct and commands toward Roark at the construction site were directed by Richardson and Konitski and executed by Jordan, Falcon and Rattley. Roark was told to face the front of the van. The handcuffs and blindfold were removed. The kidnappers stood behind him and passed the papers over his shoulder. He was handed a copy of the deed to his house and was told to make sure that his signature conformed to that on the deed. Roark signed two blank deeds and a promissory note for $280,000. After each signing, a photograph of Roark was taken. Roark was given a bank account number and was told to deposit $260,000 in this account or his wife and son would be killed. The account later was proven to be Richardson's business checking account. Roark was driven back to the vicinity of his hotel and released.

When he reached his hotel, Roark contacted the local police and the FBI. He identified Richardson to the FBI as likely to be involved in the kidnapping. Falcon and Jordan became suspects almost immediately because hotel and plane reservations in their names had been traced to Richardson. FBI agents in Bridgeport were sent to Falcon's last known apartment residence there and were admitted by Juan Falcon, appellant Falcon's brother. Juan told the agents that his brother had vacated the apartment and that Juan and a friend now occupied it. After being informed of his right to refuse to allow the

agents to search the apartment, Juan signed a consent to search form. The agents discovered and seized, among other evidence, a cassette tape labelled "Delta Enterprises, Confidential, Do Not Play". Without obtaining a warrant, the agents listened to the tape, which contained a telephone conversation between Falcon and Konitski.

Meanwhile, Konitski, Falcon and Jordan had returned to Colorado. Stranahan was contacted by the FBI. She warned the three men. They hid weapons and other evidence in a cabin and concocted a story to tell the FBI if they were arrested. All three were arrested in Colorado on May 19.

Once in custody, Jordan was advised of his rights and stated that he understood them. He waived his rights to remain silent and to have an attorney present. He told the story that had been agreed upon by the three men. When he was finished, he was told by the agents that his story did not conform to Konitski's. Jordan then told what he characterized as the "true" story.

On May 25, 1984, a three count indictment was returned charging appellants and four others [1] with the offenses set forth at the beginning of this opinion. After a jury trial, Falcon and Jordan were convicted and on August 20, and September 4, 1984, respectively, were sentenced as stated above. From their judgments of conviction, these appeals have been taken.

## II.

With these facts in mind, we turn first to the principal claim of error raised, namely, the propriety of the search and seizure at appellant Falcon's former apartment in Bridgeport, Connecticut.

Appellant [2] argues that the seizure of evidence from the apartment previously oc-cupied by him violated his Fourth Amendment rights. Falcon concedes that his brother's consent to the search of the apartment was valid but argues that such consent did not allow the *seizure* "of property from the bedroom when that property is specifically denominated as the property of another." Falcon also argues that the playing of the tape that was seized constituted a separate "search" for which a warrant was required. We hold that neither argument has merit on the facts of this case.

■ Appellant concedes that the written consent signed by his brother authorized a search of the apartment and the seizure of evidence. Appellant does not challenge the voluntariness of the consent. A third-party consent is a valid authorization to search, absent a warrant, if the consenting party has both access to the area and either a substantial interest in or common authority over the property. *United States v. Matlock*, 415 U.S. 169, 171 n. 7 (1974); *United States v. Buettner-Janusch*, 646 F.2d 759, 765 (2d Cir.1981), *cert. denied*, 454 U.S. 830 (1981); *see United States v. Brown*, 540 F.2d 1048, 1056 (10th Cir.1976), *cert. denied*, 429 U.S. 1100 (1977). Such consent does not depend upon the law of property but, rather, is premised upon the recognition that one who subjects his property to the joint or exclusive control of another assumes the risk that consent will be granted by the other to a search of the property. *Matlock, supra*, 415 U.S. at 171 n. 7. It is beyond question that Juan Falcon solely occupied the bedroom in the apartment that previously had been his brother's and that the contents of that room fell within his exclusive control. Appellant attempts to distinguish between consent to search and consent to seize on the basis of his property interest in the

---

**1.** In addition to appellants, the following were named as defendants in the indictment:

Patricia Stranahan (found guilty after jury trial).
Bruce Richardson (pled guilty).
Robert Konitski (pled guilty and testified for government).

Michael Rattley (pled guilty and testified for government).

**2.** In this section of the opinion, when we refer to "appellant", we refer to appellant Falcon.

seized items. This distinction, however, has long since been discredited.

■ In *Warden v. Hayden,* 387 U.S. 294 (1967), it was held that property interests do not "control the right of Government to search and *seize*". *Id.* at 304 (emphasis added). Rather, "the principal object of the Fourth Amendment is the protection of privacy rather than property, and [we] have increasingly discarded fictional and procedural barriers rested on property concepts." *Id.* In short, since Juan Falcon had complete access to and control over the items seized, he effectively gave the necessary consent absent a warrant.

■ Moreover, even if the consent to seize were found to be insufficient, the seizure would have been lawful because the items seized were in plain view. In *United States v. Dichiarinte,* 445 F.2d 126 (7th Cir.1971), it was held that "if the government agents acting within the parameters of the [consent to search] had come upon contraband, fruits or instrumentalities of crime, or clear evidence of criminal behavior which was lying in plain view, they could have seized those items." *Id.* at 130; *see also Warden, supra,* 387 U.S. at 306–07. Once the agents were lawfully in place, they were entitled to seize items that they had probable cause to believe were evidence of crime. As the Supreme Court held in *Texas v. Brown,* 460 U.S. 730 (1983), " 'plain view' provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment." *Id.* at 738 (plurality opinion); *accord, id.* at 748–49 (Stevens, Brennan, and Marshall, JJ., concurring). Since appellant concedes, as he must, that Juan Falcon had the authority to consent to the search of his apartment, the agents' access to the seized items was amply justified.

Appellant also argues that his brother did not have authority to consent to the

playing of appellant's tape that was labelled "Delta Enterprises, Confidential, Do Not Play", relying on *Walter v. United States,* 447 U.S. 649 (1980) (plurality opinion). *Walter,* however, is inapplicable to the instant case. In *Walter,*[3] the Supreme Court held that the viewing by federal agents of movies without a warrant violated the Fourth Amendment even though the agents had obtained possession of the movies lawfully. 447 U.S. at 654 (plurality opinion); *id.* at 660 (White and Brennan, JJ., concurring). *Walter,* however, involved facts and principles significantly different from those present here.

First, the federal agents in *Walter* came into possession of the films after they already had been seized by private individuals employed by an air courier service. Thus, the strictures of the Fourth Amendment were not applicable to the seizure. *Id.* at 656. *Walter* did not involve a consent search and seizure as in this case. Indeed, the Court distinguished such searches by stating, "When an official search *is properly authorized* —whether by consent or by the issuance of a valid warrant—the scope of the search is limited by the terms of its authorization." *Id.* (emphasis added).

Second, the holding of the *Walter* plurality opinion is premised, in part, on the proposition that, "When the contents of the package are books or other materials arguably protected by the First Amendment, and when the basis for the seizure is disapproval of the message contained therein, it is especially important that [the warrant] requirement be scrupulously observed." *Id.* at 655. No such First Amendment right is implicated here. We hold that *Walter* is inapposite. *See United States v. Bonfiglio,* 713 F.2d 932, 938–39 (2d Cir. 1983).

■ In *Bonfiglio,* the court held that the seizure and playing of an audio tape did not

---

**3.** In *Walter,* Justice Stevens announced the judgment of the Court and wrote what we have termed the "plurality opinion". Only Justice Stewart concurred in that opinion in its entirety. Justice Marshall concurred in the judgment.

Justices White and Brennan concurred in the opinion in part and concurred in the judgment. Needless to say, *Walter* is of dubious precedential value.

violate the Fourth Amendment. First, the court held that the seizure of the tape, once the agents were lawfully in place, was permissible under the plain view doctrine. 713 F.2d at 936. Second, the court held that the defendant in that case had an insufficient expectation of privacy in the contents of the tape to require obtaining a warrant before playing it. *Id.* at 937. Although the facts of that case are somewhat different from those of the instant case, we reach the same conclusion.

Since appellant labelled the tape "Confidential, Do Not Play", it is apparent that he had a subjective expectation that what was on the tape would be safe from inspection by his brother or anyone his brother might permit to listen to it. That expectation, however, was objectively unreasonable. The tape was not locked away, hidden or sealed. It was stored with other tapes that had only music on them. His brother had access to a tape player that was near the place where the tape was stored. In short, Juan's access to and control over the tape was absolute. He could have played it at any time, whether by design or by accident. We hold that, once the agents were justified in seizing the tape, no additional authority was necessary for the agents to play the tape.

◼ Appellant further argues that the agent lacked probable cause to seize the tape because, at the time of the search, the existence or relevance of Delta Enterprises was unknown. This contention is spurious. Near the place where the tape was discovered, the agent found a "shopping list" of kidnapping tools, including a pistol, handcuffs, and a telephone recording device with appellant's business card taped to it. The card indicated that Falcon offered himself for hire as a mercenary. On the facts known to the agent, it was surely reasonable to believe that appellant recorded telephone conversations that took place in the course of his "business" and that conversations related to the kidnapping would have been recorded. Moreover, although we do not agree that the label on the tape was sufficient to put its *contents* in plain view

as argued by appellee, it was sufficient, under all the circumstances, to establish probable cause to believe that the tape was evidence of the crime under investigation.

We hold that appellant's Fourth Amendment rights in no way were violated by the search or seizure of any of his property.

### III.

◼ Appellant Jordan argues that the district court erred in denying his motion to suppress his confession and the evidence derived therefrom. He asserts that his confession was involuntary in that it was obtained through an implied promise of lenity in violation of the Fifth Amendment. *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (per curiam). We agree with the district court that no such promise, implied or express, was made.

◼ Our resolution of this issue depends upon an assessment of "both the characteristics of the accused and the details of the interrogation", *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973), in determining "whether, under all circumstances, his confession was voluntary." *United States v. Brown, supra*, 540 F.2d at 1053.

◼ The government was required to prove voluntariness only by a preponderance of the evidence. The mere fact that Jordan's testimony at the suppression hearing conflicted with that of the FBI agents who interviewed him is insufficient in itself to require reversal. Moreover, we are required on appeal to view the facts in the light most favorable to the government.

The record demonstrates that the then 21 year old Jordan was neither uneducated nor illiterate. He operated an auto repair business with his brother and worked for several private investigative agencies. At the time of his arrest and questioning, he was alert, in good physical condition, and not under the influence of drugs or alcohol. He was informed of his rights. He was not subjected to any violence or threat of violence. He was provided with food and soft drinks. He was allowed to use the bathroom. Most of the questioning was con-

ducted by a single agent. A second agent was present only when a witness was required at the time of Jordan's oral statement and waiver of his rights. In short, none of the usual emblems of coercion was present.

Jordan testified that he was promised that "They would help me get off" if he made a statement. He also testified, however, that, after being told that his original story did not coincide with Konitski's, "I knew at that time there was no point in going through with Konitski's way and that the truth should come out at that time." The FBI agent testified that he told Jordan three times that he could not make any promises but would make his cooperation known to the United States Attorney. The agent told Jordan that only the United States Attorney and the judge could make such determinations.

We are convinced that, based upon his characteristics and the surrounding circumstances, Jordan's confession was freely and voluntarily given and was not the result of a promise or threat sufficient to "overbear his will." *United States v. Robinson*, 698 F.2d 448, 455 (D.C.Cir.1983). It is clear, moreover, that Jordan decided to tell the truth when it became apparent that the pre-arranged story would not be believed. While in hindsight he might think that this was not the wisest course, it is the one that he chose at the time.

Absent coercion or overreaching on the part of government agents sufficient to offend the Constitution, we hold that Jordan's confession was freely and voluntarily made.

### IV.

Appellants raise several other issues that require only a brief discussion. Both Falcon's and Jordan's primary defense at trial was that they were coerced by fear into cooperating in the kidnapping. Specifically, Falcon argues that he was coerced by Konitski, and Jordan argues that he was coerced by both Konitski and Falcon.

Falcon argues that the district court should have combined the coercion instruction with the essential elements instruction for each count. He argues that the jury should have been instructed that absence of coercion was an additional element of each crime charged. We disagree. Coercion is an affirmative defense which the government must disprove beyond a reasonable doubt only after the issue has been raised. *United States v. Bailey*, 444 U.S. 394, 412–13 (1980); *United States v. Corrigan*, 548 F.2d 879, 881–82 (10th Cir. 1977). As such, we hold that it is not error to give an instruction on coercion separately from the elements of the crime as long as the instruction makes clear, as here, that the burden rests upon the government to disprove coercion beyond a reasonable doubt. *United States v. Jackson*, 569 F.2d 1003, 1009 & n. 14 (7th Cir.1978), *cert. denied*, 437 U.S. 907 (1978); *see Corrigan, supra*, 548 F.2d at 883.

Jordan argues that he was prejudiced by the joinder of his trial with Falcon's because his defense conflicted with Falcon's and tended to confuse the jury. We disagree. First, although Falcon contended that he was coerced by Konitski and Jordan argued that he was coerced by Falcon and Konitski, these defenses are not irreconcilable. The jury was entirely free to believe that Falcon coerced Jordan only because he feared Konitski. Second, a defendant has a heavy burden of showing real prejudice because of misjoinder. *United States v. Burrell*, 720 F.2d 1488, 1492 (10th Cir.1983). Jordan has failed to sustain that burden. We hold that the defenses were not irreconcilable and that the joinder of appellants did not lead to confusion of the jury.

Jordan's coercion defense as to Konitski was based upon his asserted fear of Konitski because Konitski owned an Uzi submachine gun. Jordan argues that the court's refusal to allow him to introduce in evidence a video tape that displayed the firepower of such a weapon was an abuse of discretion and constituted reversible error. Since Jordan previously had present-

ed the testimony of a firearms expert who described the capabilities of the weapon, we hold that the tape would have been cumulative and its exclusion was not an abuse of discretion.

 Jordan argues that his cross-examination of Konitski was improperly limited by the court. After a careful review of the record, we conclude that the district court limited Jordan's attempt to impeach Konitski only when the questioning became repetitive. We hold that the court did not abuse its broad discretion in limiting the scope of cross-examination. *United States v. Singh,* 628 F.2d 758, 765 (2d Cir.), *cert. denied,* 449 U.S. 1034 (1984); *United States v. Lavallie,* 666 F.2d 1217, 1220 (8th Cir.1981). Jordan was not denied his right to confront the witness against him.[4]

### V.

Appellants were convicted by a jury on the basis of overwhelming evidence after a fair trial of serious crimes committed more than a year ago. We have reviewed carefully appellants' numerous claims of error. We hold that none has merit.

Affirmed.

---

**4.** Appellants also argue that the travel to Colorado was too tangential to the kidnapping in New York to support a conviction under the Travel Act and that there was insufficient evidence of their intent with regard to that travel. Both contentions lack merit. It is clear that the government proved beyond a reasonable doubt that appellants had the necessary intent. *United States v. Barbieri,* 614 F.2d 715, 718 (10th Cir. 1980). It is equally clear that the travel made the subsequent kidnapping "less difficult" to accomplish. *Id.* Since the conduct at the end of the travel need not be unlawful in itself, *United States v. Jones,* 642 F.2d 909, 913 (5th Cir.1981); *United States v. Perrin,* 580 F.2d 730, 736 (5th Cir.1978), *aff'd,* 444 U.S. 37 (1979), we hold that the convictions were proper.