OPINION
{¶ 1} After his motion to suppress evidence was overruled, Darrell Pancake entered a plea of no contest to a charge of voyeurism, a third degree misdemeanor. The trial court found Pancake guilty and imposed a sixty-day jail sentence, fifty days of which were suspended; a $500 fine, $350 of which was suspended; and two years probation.
 {¶ 2} On appeal, Pancake asserts error as follows:
 {¶ 3} "1. The Trial Court Erred By Overruling Defendant's Motion To Suppress The Evidence Recovered From The Illegal Search Of Defendant's Camcorder."
 I. {¶ 4} The facts are drawn from the police reports, which the parties stipulated to be the evidence in the case. The trial court's factual findings are as follows:
 {¶ 5} "On January 6, 2002, the Oakwood Police Department took a complaint from a woman who resides in Oakwood, Ohio (the `victim'). She `stated that after she exited the shower and started dressing, she observed what she thought was a camera setting on the outside bedroom window ledge.'
 {¶ 6} "The victim further stated she had gone over to the window and shut the blinds the rest of the way to her bedroom, but when she got over to the window, the silver object was gone.
 {¶ 7} "On January 15, 2002, Defendant Darrell Pancake was arrested by the Dayton Police Department after they were summoned to a residence on Firwood Drive on a possible `peeping tom.' Upon arrival Officer Bell observed the Defendant with video camera looking into the victim's window. A foot chase ensued. The Defendant was taken into custody at which point a camcorder was taken from this person.
 {¶ 8} "After Dayton officers viewed the videotape that was found inside the camcorder, they learned that Defendant had been surreptitiously videoing women through windows of their residences.
 {¶ 9} "On January 25, 2002, Detective Jeffrey Yount of the Oakwood Police Department went to the Dayton Police Department to view the videotape to determine whether the Oakwood victim appeared on the tape. After viewing the tape, it was decided to show the victim the tape to see if she could identify herself.
 {¶ 10} "On January 29, 2002, after viewing the tape, the victim immediately identified herself.
 {¶ 11} "A warrant was then issued from Oakwood Municipal Court for Defendant's arrest."
 II. {¶ 12} The trial court cast the issue as follows:
 {¶ 13} "May a police officer, who seizes a camcorder tape recorder incident to an arrest for voyeurism, view the recording without first obtaining a search warrant where the offender is observed in the act of tape recording into a victim's bedroom window prior to the arrest?
 {¶ 14} "May a police officer, from a second jurisdiction who learns that a peeping tom has been arrested in a first jurisdiction view and/or have the victim view the videotape obtained from the defendant incident to the initial arrest for the purpose of determining whether the victim was one of several women who had been videotaped by the Defendant, without first obtaining a search warrant?
 {¶ 15} "The issues presented appear to be issues of first impression in Ohio."
 III. {¶ 16} The trial court's essential resolution of the issue is as follows:
 {¶ 17} ". . . the officer's observations at the window had the practical effect of giving an ordinary police officer probable cause to associate an object (camcorder) with a specific criminal activity (voyeurism). The Defendant had no expectation of privacy in the contents of the tape, and the contents of the tape were, in effect, placed in plain view by the Defendant's own actions.
 {¶ 18} "The viewing by the Dayton police later was, therefore, reasonable and constitutional. Ten days later, the Oakwood Police viewed the tape. Again, the Defendant had no real privacy interest to protect, especially where he exhibited the camcorder to the victim in Oakwood. The Oakwood Police's viewing was, therefore, also reasonable and constitutional."
 IV. {¶ 19} We agree with the trial court that the issue is one of first impression in Ohio. We also believe that the first paragraph of the issue as stated by the trial court, supra, presents the primary question in this appeal, and that the answer to the question in the second paragraph will be dictated by, and be the same as, our answer to the primary question. Finally, we acknowledge that our answers have not been reached without difficulty.
 {¶ 20} Preliminarily, we note that there was no illegality in the police seizure of the camcorder. Pancake was literally caught in the act of voyeurism.
 {¶ 21} The question, as stated by the trial court, was whether the police should have obtained a warrant to view the videotape. If a warrant was required, no exception to the warrant requirement was present. The camcorder was in police custody and beyond Pancake's reach, and time was not of the essence.
 {¶ 22} In Walter v. United States (1980), 447 U.S. 649, twelve large, securely sealed packages were misdelivered to a business in Georgia. Employees of the business opened the packages and discovered boxes containing film. The labeling on the boxes indicated that the films inside were obscene. The business turned the packages over to the FBI, whose agents viewed the films with a projector without having first obtained a warrant. Defendants were indicted on obscenity charges and moved to suppress. The district court overruled the motion and the court of appeals affirmed 2-1. In a 5-4 decision, the supreme court reversed, holding that a warrant authorizing the FBI agents to view the films should have been obtained. The court stated in part:
 {¶ 23} "The fact that FBI agents were lawfully in possession of the boxes of film did not give them authority to search their contents. Ever since 1878 when Mr. Justice Field's opinion for the Court in Exparte Jackson, 96 U.S. 727, 24 L.Ed. 877, established that sealed packages in the mail cannot be opened without a warrant, it has been settled that an officer's authority to possess a package is distinct from his authority to examine its contents. See Arkansas v. Sanders, 442 U.S. 753,758, 99 S.Ct. 2586, 2590, 61 L.Ed.2d 235; United States v. Chadwick,433 U.S. 1, 10, 97 S.Ct. 2476, 2482, 53 L.Ed.2d 538.
 {¶ 24} "* * *
 {¶ 25} "The projection of the films was a significant expansion of the search that had been conducted previously by a private party and therefore must be characterized as a separate search. That separate search was not supported by any exigency, or by a warrant even though one could have easily been obtained.
 {¶ 26} "The Government claims, however, that because the packages had been opened by a private party, thereby exposing the descriptive labels on the boxes, petitioners no longer had any reasonable expectation of privacy in the films, and that the warrantless screening therefore did not invade any privacy interest protected by the Fourth Amendment. But petitioners expected no one except the intended recipient either to open the 12 packages or to project the films. The 12 cartons were securely wrapped and sealed, with no labels or markings to indicate the character of their contents. There is no reason why the consignor of such a shipment would have any lesser expectation of privacy than the consignor of an ordinary locked suitcase. The fact that the cartons were unexpectedly opened by a third party before the shipment was delivered to its intended consignee does not alter the consignor's legitimate expectation of privacy. The private search merely frustrated that expectation in part. It did not simply strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection. Since the additional search conducted by the FBI — the screening of the films — was not supported by any justification, it violated that Amendment." Pp. 654, 657-9.
 {¶ 27} In United States v. Bonfiglio (2nd Cir. 1983), 713 F.2d 932, federal agents, in the course of executing a search warrant, discovered a small manila envelope marked "Tap on Ben Bon Hoft." Inside the envelope, an agent found a tape cassette marked "Ben." The agent played the tape without having first obtained a warrant to do so, prompting a motion to suppress after charges were filed. The district court overruled the motion to suppress and the Second Circuit affirmed:
"III. Playing the Tape
 {¶ 28} "Appellant next argues that even if it is assumed that the tape cassette was lawfully seized, his Fourth Amendment rights were, nonetheless, violated by the agent's playing of the tape without a warrant. Citing Walter v. United States, 447 U.S. 649, 100 S.Ct. 2395,65 L.Ed.2d 410 (1980), appellant contends that listening to the tape without a warrant was, in effect, an investigatory search which violated his expectation of privacy. Once the tape had been seized and was within the control of the agents, he asserts, there was no danger that it would be destroyed. Moreover, the tape was held overnight before it was played. Thus, it is contended that the agents should have obtained a warrant before playing the tape.
 {¶ 29} "* * *
 {¶ 30} "As a preliminary matter, we note that when items have been lawfully seized, a separate warrant is required to conduct a search thereof if the individual has a high expectation of privacy in the item seized. Compare United States v. Chadwick, 433 U.S. 1, 13,97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977) (separate warrant required to open and search contents of lawfully seized footlocker, in which individual had high expectation of privacy), with Chambers v. Maroney, 399 U.S. 42,49-51, 90 S.Ct. 1975, 1980-1981, 26 L.Ed.2d 419 (1970) (no separate warrant required to search lawfully seized car, in which individual had diminished expectation of privacy). Here, the notation on the envelope `Tap on Ben Bon Hoft,' under the circumstances which occurred herein, had the practical effect of putting the contents of the tape in plain view and therefore reducing the expectation of privacy. See United States v.Martino, 664 F.2d 860, 874 (2d Cir. 1981), cert. denied, 458 U.S. 1110,102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982) (contents of bag in plain view since bag in plain view and defendant told police what was in bag; statements demonstrate a reduced expectation of privacy); United Statesv. Candella, 469 F.2d 173, 175 (2d Cir. 1972) (guns in container in defendant's house were in plain view since container was in plain view and defendant told police that guns were in container). Thus, once the cassette was lawfully seized by ATF agents, given the written revelation of its content, Bonfiglio no longer had a `reasonable expectation of privacy sufficient to justify independent constitutional protection' of the recorded statement. Martino, 664 F.2d at 874.
 {¶ 31} "We conclude that here, unlike Chadwick, Bonfiglio's expectation of privacy with respect to the recorded statements was insufficient to justify separate constitutional protection first for the search and then, separately, for the seizure. The district court did not err, but correctly held that once the tape was lawfully in the possession of the agents, `they had a right to play it and were not required to get a separate search warrant.'" Pp. 936-7.
 V. {¶ 32} The trial court here reasoned that Pancake virtually advertised that his camcorder contained a videotape of surreptitiously obtained images of women in various stages of undress when he was caught redhanded with a camcorder looking into a woman's bedroom window. Thus, as in Bonfiglio — which the trial court cited — Pancake's actions "had the practical effect of putting the contents of the (videotape) in plain view and therefore reducing the expectation of privacy."
 {¶ 33} We conclude that the facts before us are closer to those inBonfiglio than those in Walter. It follows that the Dayton police were not required to obtain a warrant to view the videotape in the camcorder, and that the Oakwood officer was not required to obtain a warrant before asking the Oakwood complainant to view the tape.
 {¶ 34} The assignment of error is overruled.
 {¶ 35} The judgment will be affirmed.
FAIN, P.J. and YOUNG, J., concur.