823 F.2d 549
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America Appellee,
v.
James M. DeBARDELEBEN, Appellant.
 No. 85-5164.
 United States Court of Appeals, Fourth Circuit.
 Submitted May 29, 1987.
Decided June 23, 1987.
 
 D.Md.
 AFFIRMED.
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Walter E. Black, Jr., District Judge. (Cr. No. B-84-00043)
 James M. DeBardeleben, appellant pro se.
 Breckinridge L. Willcox, United States Attorney; Max H. Lauten, Assistant United States Attorney, Juliet A. Eurich, Assistant United States Attorney, on brief) for appellee.
 Before RUSSELL, PHILLIPS and MURNAGHAN, Circuit Judges.
 PER CURIAM:
 
 
 1
 James M. DeBardeleben appeals his conviction for kidnapping in violation of 18 U.S.C. Sec. 1201(a). The district court sentenced DeBardeleben to a term of imprisonment of 180 years, the sentence to run consecutively to previously imposed sentences of 135 years for unrelated federal offenses. DeBardeleben contends that the district court erred in denying his motions to suppress certain evidence; that the government has conducted a policy of vindictive prosecution against him; that his sentence is so excessive as to amount to cruel and unusual punishment in violation of the Eighth Amendment; and that the waiver of his Sixth Amendment right to counsel was invalid. We find no reversible error and affirm the judgment of the district court.
 
 I.
 BACKGROUND
 
 2
 Beginning in 1979 the United States Secret Service began investigating the passing of a new type of counterfeit $20 Federal Reserve note. Because of the pattern of passing the notes in shopping malls, the United States Secret Service referred to the passer as the "Mall Passer." On May 25, 1983, the "Mall Passer" was arrested in Tennessee. The passer was carrying identification in the name of Roger Collin Blanchard, a revolver, and two sets of car keys. One set of keys was for a Chrysler vehicle. Later that evening after the mall closed, a Secret Service agent returned to the shopping mall and observed three vehicles parked near the exit where the mall passer was heading at the time of his arrest. One of the vehicles was a Chrysler. A check of the vehicle identification number of the Chrysler showed that it was registered to a James Richard Jones, 201 South Reynolds Street, Alexandria, virginia. The agent tried the Chrysler keys in the vehicle and, upon discovering that the keys opened the vehicle, obtained a warrant for its search. The search of the Chrysler produced counterfeit notes, false identification documents, and a police badge.
 
 
 3
 The Secret Service in Washington, D.C. was notified of the Mall Passer's arrest and was given a physical description of him. The Secret Service agents in Washington applied for and obtained a search warrant for the Reynolds Street apartment. The search warrant for the apartment authorized the agents to search for
 
 
 4
 counterfeit Federal Reserve notes and materials and equipment used to manufacture counterfeit Federal Reserve notes, including, but not limited to, paper, plates, ink, colors, negatives, photo equipment, and cutting material; identification documents, including but not limited to driver's licenses, automobile registrations and credit cards; which are the fruits, evidence and instrumentalities of crimes against the United States, that is uttering counterfeit United States obligations and securities and possessing counterfeit implements in violation of Title 18, United States Code, Sections 472 and 474.
 
 
 5
 Fingerprints taken from the Mall Passer revealed his true identity to be James Mitchell DeBardeleben. After learning the true identity of the Mall Passer, Secret Service Agents Mertz and Foos reviewed DeBardeleben's 1976 counterfeiting conviction file.
 
 
 6
 During the apartment search the agents discovered a yellow pages telephone book which had a blank sheet of paper inserted at the "moving and storage" section. The agents pursued this lead and discovered that Locker 230 at the Landmark Mini-Storage facility located in Alexandria, Virginia, was leased to the defendant under the name of James R. Jones. The agents applied for and obtained a search warrant authorizing them to search the locker and all containers in the locker for the same items described in the apartment search warrant.
 
 
 7
 The search of the locker began at 8:00 p.m. on May 28, 1983. Prior to the search the agents who would be conducting it held a briefing in order to explain to each other the background of the case and for what types of evidence they would be searching. Two of the agents, Mertz and Foos, knew by that time that DeBardeleben's criminal history included a prior sexual offense charge, a gun charge, an assault and attempted murder charge, and the 1976 counterfeiting conviction. The agents' focus at this time, however, was still on the counterfeiting investigation.
 
 
 8
 The locker was a five by five by eight foot cubicle and contained a number of items. Because of the poor lighting in the locker the agents moved the contents to a concrete hallway outside of the locker.
 
 
 9
 The agents seized a number of items from Locker 230, some of which related to the counterfeiting investigation. The agents also seized other items that they believed to be evidence of other crimes. These other items included red and blue emergency or police-type bubble lights; handcuffs; ammunition; nude photographs of various women, some of which depicted sodomy and did not appear to be commercially produced; nylon rope; books relating to fraud; false identification; drugs and drug paraphernalia; cassette tapes, including one marked "GTWN connection"; a siren; blank keys and molding clay; and a pouch containing rope, handcuffs, shoe laces, gloves, and a choker chain. Several of these items, including some of the cassette tapes and photographs, were found in two footlockers located in the storage facility. The footlockers were full of material and contained hundreds of pages of handwritten notes commingled with counterfeit Federal Reserve notes and counterfeiting paper.
 
 
 10
 The Landmark search did not produce the counterfeit currency printing plant that the agents had hoped to find. At this point in the search it was 11:00 p.m. and the manager of the facility desired to close up for the evening. The agents believed that the various notes and papers in the footlockers contained valuable information about the location of the printing plant as well as evidence of DeBardeleben's counterfeiting activities. The agents also knew that a thorough search of the notes would be time consuming. As a result of these factors, and in order to maintain the integrity of the footlockers, the agents decided to seize the two footlockers in their entirety, as well as the other suspicious items which they believed related to police impersonation. The agents placed the items not seized back in the storage locker.
 
 
 11
 The agents immediately took the evidence seized during the Landmark search to the Washington Secret Service Office. In the early morning hours of May 29, 1983, Agent Mertz began to examine the handwritten notes for leads to the location of the printing plant. The notes contained many references to counterfeiting activity. in addition to the counterfeiting references the notes contained other references which indicated that DeBardeleben was involved in other criminal activity. The notes referred to weapons, making and taping telephone calls, transcribing tape recordings, handwritten scripts for phone calls which appeared to relate to cheating and defrauding people, and references to taking along identification and license tags.
 
 
 12
 Agent Mertz also read notes which indicated to him that DeBardeleben was a sexual offender. One of the seized papers contained a list of items and comments such as "plenty of rope," "belt with 0-ring for waist," "electric prod," "K-Y," "cameras," "rainy and weekend best, 3:30 a.m. Thursday night--Friday morning, in, 3:30 a.m. Sunday night--Monday morning, out," "plenty of groceries," "plenty of gas," "reserve gas tank or cans stashed in the country," "hood for inside (PIC taking & other when I want to observe eyes)," "I-Bolts in car: frnt [sic] floor (2), back floor (2), (2) trunk," and "say original statements and beg." This last statement was followed by sexually explicit comments. Other handwritten notes appeared to refer to police impersonation and what appeared to Agent Mertz to be descriptions of how to abduct someone.
 
 
 13
 After skimming the notes Agent Mertz came across several cassette tapes which were lying in the bottom of the footlockers or in portfolios. One of the tapes was labeled "Carol." Mertz testified at the suppression hearing that he knew from his review of DeBardeleben's file that Carol was the name of DeBardeleben's fourth wife. Mertz also believed, from the information contained in the 1976 counterfeiting investigation file, that Carol had been involved in DeBardeleben's 1976 counterfeiting activities. Mertz testified that he was convinced that this tape contained evidence of counterfeiting or other criminal activity. At approximately 4:00 a.m. on May 29th Mertz played portions of the tape. Mertz did not listen to the tape in its entirety at this time; instead he testified that he would listen for several minutes, then fast-forward to another portion of the tape. This type of review of the tape revealed to Mertz sexual activity which appeared to be consensual as well as nonconsensual. The tape contained a recording of sexual activity between a man and a woman. Portions of the tape indicated to Mertz that acts of sodomy were taking place which sounded to Mertz to be nonconsensual on the woman's part, in that she seemed to be undergoing sexual abuse against her will.
 
 
 14
 In his examination of the Landmark material Agent Mertz also found postal receipts for money orders used to pay rent on other storage lockers. Prior to leaving his office that morning Mertz left the postal receipts and the "Carol" tape for Agent Foos to examine when he came in later that morning. The postal receipts led to the discovery of another storage locker in Manassas, virginia, which was then being leased by "James Jones." The Secret Service applied for and obtained a search warrant for locker C-75 at Manassas Private Storage. The warrant authorized the agents to search for and seize the same items described in the apartment and the Landmark warrants.
 
 
 15
 The search of the Manassas storage locker began on May 29, 1983. The agents were again briefed that the search was for counterfeiting paraphernalia. The Manassas locker measured five by eight by ten feet and when opened was discovered to be filled. The agents moved the contents of the locker to the outside pavement to facilitate the search. The locker contained, among other things, three footlockers packed full of envelopes and other, smaller containers filled with counterfeit notes, trimmings, half-toned paper, handwritten notes, and false identification--all of which were commingled. The footlockers also contained license plates, weapons and ammunition, and handcuffs. The Manassas search also revealed the counterfeiting plant, counterfeiting supplies, drugs in vials without prescription labels, and drug and sex paraphernalia.
 
 
 16
 The agents, after thoroughly searching the entire storage locker, decided to take all of the evidence of counterfeiting, and all of the evidence of other crimes, back to the Secret Service Office. The agents seized the footlockers in their entirety because of the commingled nature of their contents and to maintain the integrity of the footlockers. Additionally, the search was being conducted in an open-air area without cover, the day was overcast, there was occasional rain, and the search was blocking access to other lockers in the storage facility.
 
 
 17
 The items from the Manassas search were brought back to the Secret Service Office and the agents began sorting through the evidence seized from both the Landmark and the Manassas searches. A few days later the agents realized that some of the evidence from the two storage locker searches had become commingled. The commingled items included handwritten notes, photographs of women, and cassette tapes.
 
 
 18
 In the course of reviewing the accumulated and now partially commingled evidence, Agent Foos located another cassette tape with the name "Becky" handwritten on it. The "Becky" tape was one of the items that became mixed. The agents were unable to determine whether it came from the Landmark or the Manassas search. Foos expected the tape to contain material similar in nature to that found on the "Carol" tape. Specifically, he expected the tape to contain sounds of a woman being abused. Foos testified at the suppression hearing that prior to listening to the "Becky" tape he had reviewed a large number of handwritten notes, seized in the searches of the storage lockers, which to Foos evinced crimes against, and hatred for, women. Foos also had reviewed many of the photographs, which the agents had seized during the searches, of nude women who were posing or who were engaged in various acts of sodomy.
 
 
 19
 Foos' review of the "Becky" tape revealed what sounded to him to be both consensual sexual activity on the part of one woman and nonconsensual sexual activity involving a different woman. The second woman on the tape sounded to Foos to be undergoing sexual abuse. Additionally, certain references on the tape indicated that this woman was being detained in a place against her will. The woman's voice on this portion of the tape was subsequently identified as that of the victim in this case. The man's voice was identified as belonging to DeBardeleben.
 
 
 20
 Based in part on the handwritten notes, the "Becky" tape, and other evidence reviewed to that point, and within two days of the Manassas search, the Secret Service put together a synopsis which indicated that the Service believed that DeBardeleben, in addition to other things, may have been involved in violent sex crimes. This synopsis was teletyped to all Secret Service offices. At this point the Secret Service investigation widened to include crimes against women.
 
 
 21
 At the end of July 1983 the Secret Service, pursuant to search warrants, searched DeBardeleben's apartment storage room, and re-searched the Manassas storage facility. These warrants authorized the agents to search for additional counterfeiting activity and for evidence of crimes against women. The Secret Service did not obtain an additional warrant for evidence at the Landmark storage facility because, on May 29, 1983, the locker had been cleaned out by the management for non-payment of rent and the contents were considered by the Landmark management to be abandoned property. Landmark management personnel had thrown away a number of items including pornographic magazines and pictures, a dildo, and a bag containing women's underwear soaked with blood. The management gave the Secret Service agents permission to take the remaining items.
 
 
 22
 The Secret Service, subsequent to these later searches, put together a book of photographs depicting the faces of women whose photographs had been discovered in the storage lockers. In September 1983 an FBI agent identified one of the pictures as the victim in this case.
 
 
 23
 DeBardeleben represented himself during the lengthy suppression hearing and at trial, having dismissed three attorneys who were appointed at separate times to represent him. At DeBardeleben's trial the government used only a portion of the evidence seized from the various searches. The most damaging evidence to DeBardeleben's case clearly was photographs of the victim being sexually assaulted, taken contemporaneously with the assault, and the "Becky" cassette tape which was identified as a contemporaneous recording of DeBardeleben sexually abusing the victim.
 
 
 24
 DeBardeleben presents several grounds for vacating his conviction. DeBardeleben argues (i) that the Landmark search on May 28, 1983, resulted in a wholesale seizure of property outside the scope of the warrant; (ii) that the Secret Service should have obtained an additional warrant prior to playing the cassette tapes seized during the Landmark search; (iii) that the government has conducted a policy of vindictive prosecution against him; (iv) that his sentence is so excessive and disproportionate to his crime that it is cruel and unusual punishment in violation of his constitutional rights; and (v) that he was forced into an unconstitutional choice of either accepting ineffective counsel or proceeding without counsel, making the resulting waiver of his Sixth Amendment right to assistance of counsel invalid.
 
 
 25
 Each of these assignments of error will be discussed in turn.
 
 II.
 THE FOURTH AMENDMENT CLAIMS
 
 26
 DeBardeleben strenuously argues that the search and seizure of a large portion of the evidence during the May 28th search of the Landmark storage facility was outside the scope of the warrant and that the agents conducted a general exploratory search which tainted later searches and later evidence. DeBardeleben also similarly challenges the May 29, 1983, Manassas search. The government contends that the Landmark and Manassas searches were not impermissibly broad in scope, and that the evidence was seized under the plain view doctrine.
 
 
 27
 DeBardeleben also argues that the seizure of the cassette tapes was illegal under the plain view doctrine and that, even if legal, the agents were required to obtain another search warrant prior to listening to the tapes. The government replies that a defendant possesses no greater expectation of privacy in the tape recordings than in his personal notes; therefore, the agents were authorized by the warrant they possessed to listen to the tapes. The government also contends that the labels on the tapes when considered with the rest of the evidence contained in the locker gave the agents reasonable cause to play the tapes.
 
 A. Scope of Search
 
 28
 It is clear from the facts developed during the suppression hearing that the Landmark and Manassas searches, pursuant to valid search warrants, were very thorough. It is also clear that a number of items were seized, and subsequently used as evidence against DeBardeleben at his trial, which were not specifically described in the warrants. Contrary to DeBardeleben's arguments, however, we believe that the search of both the Landmark and the Manassas storage facilities was within the scope of the warrants. Furthermore, we believe that the seizure of the evidence relating to other crimes, although outside the scope of the warrants, was permissible under the "plain view" exception to the warrant requirement.
 
 
 29
 Several principles of search and seizure law are so well established that they require little additional analysis here. General warrants and general searches are, of course, prohibited by the Fourth Amendment. Andresen v. Maryland, 427 U.S. 463, 480 (1976).
 
 
 30
 DeBardeleben challenges the May 1983 searches as being general and exploratory and, therefore, illegal. The search warrants for both the Landmark and Manassas lockers authorized the agents to search the entire lockers for counterfeit Federal Reserve notes, materials and equipment used to manufacture the notes, and for identification documents; these are the fruits, evidence, and instrumentalities of the crimes of uttering counterfeit United States obligations and possessing counterfeiting implements. Under the terms of the warrants, therefore, the agents were authorized to search all containers within the storage lockers that might contain counterfeit notes, counterfeit plates, seals, or other evidence of counterfeiting. These authorizations extended to the footlockers, and the briefcases and portfolios within the footlockers, because counterfeit notes could be concealed in very small places. Under these circumstances, there was no requirement that the agents stop and obtain a separate warrant every time a container was found within another container.
 
 
 31
 The warrants also authorized the agents to read DeBardeleben's handwritten notes for evidence of his counterfeiting activity. See United States v. Crouch, 648 F.2d 932 (4th Cir.), cert. denied, 454 U.S. 952 (1981); see also United States v. Wuaqneux, 683 F.2d 1343, 1352 (11th Cir. 1982), cert. denied, 464 U.S. 814 (1983). The abbreviated search of the footlockers at the storage facilities revealed numerous handwritten notes commingled with counterfeit notes and trimmings from counterfeit notes, as well as other items relating to counterfeiting and other activities. The agents specifically desired to inventory the counterfeiting evidence contained in the footlockers. They also desired, in the case of the Landmark search, to examine the handwritten notes for leads to the location of the printing plant. These interests on the part of the agents, coupled with the lateness of the hour and the Landmark storage facility manager's desire to close for the evening, prompted them to seize the footlockers in their entirety in order to continue the search at their office.
 
 
 32
 In United States v. Fawole. 785 F.2d 1141 (4th Cir. 1986), this Court reviewed a challenge to a warrant, and the search pursuant to it, as being general. In Fawole an agent of the Georgia Bureau of Investigation, while searching for evidence of another crime pursuant to a valid warrant, discovered a briefcase containing evidence of a federal crime. The agent seized the briefcase and its contents in order to make an inventory at his office. A panel of this Court held that "the seizure and return of items within a single briefcase containing evidence of a crime does not amount to the sort of 'general, exploratory rummaging in a person's belongings' proscribed by the Fourth Amendment." Id. at 1144 (quoting Coolidge v. New Hampshire, 403 U.S. at 467)).
 
 
 33
 Under the circumstances of the Landmark search we do not find the decision to seize the footlockers and their contents unreasonable for Fourth Amendment purposes. The agents were not required to seal the contents of the footlockers and return to the storage facility on another day to complete their search. United States v. Fawole, supra; United States v. Santarelli, 778 F.2d 609, 616 (11th Cir. 1985); see also United States v. Wuagneux, supra. Cf. United States v. Tamura, 694 F.2d 591 (9th Cir. 1982) (suggesting that in cases where documents are so intermingled that it is not feasible to sort them out at site of search, government should seal and hold documents pending approval of another search). Similarly, we find no error in the agents' seizure of the Manassas footlockers in their entirety based upon the commingled nature of the footlockers' contents and the circumstances surrounding continuing the search at the facility. We conclude that the search of DeBardeleben's belongings was not general or exploratory, and did not rise to a Fourth Amendment violation.
 
 B. Plain View
 
 34
 We begin our analysis of this issue mindful that warrantless searches are per se unreasonable unless they are within specific well-defined exceptions. Mincey v. Arizona, 437 U.S. 385 (1978); Katz v. United States, 389 U.S. 347, 357 (1967). One of these exceptions, and the one urged by the government in this case, is the exception for evidence discovered in "plain view." See Coolidge v. New Hampshire., 403 U.S. 443 (1971).
 
 
 35
 There are three prongs to the plain view exception. For the warrantless seizure of an item to be reasonable under the Fourth Amendment pursuant to the plain view doctrine, the officer making the seizure must be engaged in a lawful intrusion or must legitimately be in a position to view the object; second, the discovery of the evidence must be inadvertent; and, third, it must be immediately apparent that the item is evidence of a crime or contraband. See Texas v. Brown, 460 U.S. 730 (1983); United States v. Fawole, supra. During the Landmark search the agents seized a number of items which, in their view, were evidence of other crimes. Those items included red and blue emergency "bubble" lights, an automobile siren, phony police credentials and badge, police catalogs, handcuffs, and nude photographs. We find no error in the seizure, and subsequent use at DeBardeleben's trial, of these items. The government argues, and we agree, that these items were properly seized under the plain view doctrine.
 
 
 36
 The first requirement of the plain view doctrine was clearly met for all of the searches. The agents were authorized by the search warrants they possessed to search every item in the storage lockers which could contain evidence of counterfeiting. They were therefore engaged in a lawful intrusion and were legitimately in a position to view the various objects. Second, the district court, in reviewing the Landmark search, found that --18 although the agents were alerted to the other kinds of criminal activity that DeBardeleben had been involved in, from the 1976 file and the FBI "rap" sheet, the agents were only searching for counterfeiting evidence. The discovery of the evidence of crimes other than counterfeiting was, therefore, clearly inadvertent.[1]
 
 
 37
 Similarly, during the Manassas search the agents' focus was still on DeBardeleben's counterfeiting activities, not on evidence of other criminal activity which they uncovered during the search. The inadvertent discovery element was also met as to the Manassas search.
 
 
 38
 It is the third prong of the plain view doctrine that the defendant vigorously contests. Defendant argues that certain of the items seized pursuant to the plain view doctrine were legal to possess and that it was not immediately apparent that they were evidence of a crime. In short, he contends that there was no probable cause for the seizure.
 
 
 39
 To the extent that the issue of whether probable cause or some lesser standard of suspicion was required prior to seizing evidence pursuant to the plain view doctrine was unsettled, the issue has been resolved in favor of the probable cause standard. In Arizona v. Hicks, --U.S. ----, 55 U.S.L.W. 4258, 4260 (Mar. 3, 1987), the Supreme Court held that for the seizure of an item to be justified under the plain view doctrine, there must be probable cause to believe that the item is contraband or useful as evidence of a crime. The Supreme Court has frequently noted that probable cause is a flexible standard. In Texas v. Brown, the Court stated that probable cause
 
 
 40
 merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief" that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required.
 
 
 41
 460 U.S. at 742 (citations omitted).
 
 
 42
 We agree with the district court that the agents' seizure of the evidence of other crimes, although outside the scope of the warrant, was proper under the plain view doctrine. The district court, in denying DeBardeleben's motion to suppress, held that the agents were entitled to evaluate the evidentiary nature of the items discovered under plain view in light of all the information that they properly possessed at the end of the search. See also United States v. Thomas, 676 F.2d 239, 244 (7th Cir. 1980), cert. denied, 450 U.S. 931 (1981); United States v. Ochs, 595 F.2d 1247 (2d Cir.), cert. denied, 444 U.S. 955 (1979).
 
 
 43
 We agree.
 
 
 44
 By the time the agents concluded the storage locker searches they had probable cause to believe that many of the items discovered during the search, including the photographs of women, were evidence of other crimes. Many of the photographs seized were of nude women. Some of the photographs depicted acts of sodomy--a crime under both Virginia and District of Columbia statutes. The pictures were home developed and some of the negatives were found. Moreover, in some of the pictures the face of the male was hidden or obscured. In view of the other evidence found in the lockers, including references in DeBardeleben's handwritten notes to abduction of women, there was probable cause to believe that the photographs might be useful as evidence of crimes against women. While it may be true that some of the items seized are legal to possess, the possession of such items by a convicted felon with a criminal background such as defendant's gives these items added significance. The agents were not required to ignore this evidence merely because it was not specifically listed in the warrant.
 
 
 45
 We also reject DeBardeleben's arguments that the agents should have included in their affidavit for the May 29th search of the Manassas locker the other crimes evidence discovered in the Landmark search. At the time the agents applied for the May 29th Manassas warrant, less than 24 hours after the Landmark warrant, their focus was still on DeBardeleben's counterfeiting activities and on locating the printing plant. They were not, however, prohibited from seizing evidence of other crimes which they discovered in plain view. Furthermore, as a result of the "Carol" tape, the evidentiary nature of certain of the items was even more apparent to the agents.
 
 
 46
 We have carefully examined the circumstances surrounding the searches and seizures challenged by DeBardeleben on appeal, both pursuant to valid warrants and under the plain view doctrine, and his challenges to the use of this evidence at his trial. We find no error in the district court's refusal to suppress this evidence.[2]
 
 C. Cassette Tapes
 
 47
 The use of the "Becky" tape at DeBardeleben's trial was particularly damaging. DeBardeleben argues that the government's seizure of this and other cassette tapes was improper because they were outside the scope of the warrant and because it was not immediately apparent that the tapes were evidence of a crime. DeBardeleben contends, therefore, that the tapes could not be seized under the plain view doctrine. Even assuming the validity of the seizure, DeBardeleben contends that the agents needed an additional warrant prior to listening to the tapes. The government argues in response that DeBardeleben had no greater expectation of privacy in the cassette tapes than in his personal notes, and that the agents had probable cause to listen to the "Becky" tape as a result of their review of the "Carol" tape.
 
 
 48
 Both the government and the district court place heavy reliance on United States v. Bonfiglio, 713 F.2d 932 (2d Cir. 1983), in support of their contention and ruling that playing the tapes was proper. In Bonfiglio, agents of the Bureau of Alcohol, Tobacco and Firearms obtained a warrant to search the defendant's residence for firearms. In the course of their search they found a cassette tape in a small manila envelope secreted under a plywood floor. The envelope was labeled "Tap on Ben Bon Hoft." The tape was simply marked "Ben." The next day the agents played the tape. It revealed evidence of arson. The defendant challenged both the seizure of the tape as being outside the scope of the warrant and the subsequent playing of the tape without an additional warrant. The Court found that the seizure of the tape was proper under the plain view doctrine. Regarding the playing of the tape, the Court noted initially that when an item has been lawfully seized a separate warrant is required to search the item if the individual has a high expectation of privacy in the seized item. Id. at 937 (citing United States v. Chadwick, 433 U.S. 1 (1977)). The Court held, however, that the notation "Tap on Ben Bon Hoft" had the effect of putting the contents of the tape in plain view and reducing the defendant's expectation of privacy. As a result of this reduced expectation of privacy there was no need to obtain an additional warrant. The Court upheld the district court's conclusion that once the tape was lawfully in the possession of the agents, they had a right to play it. Id. at 937. The Second Circuit also rejected Bonfiglio's challenges to the use of a tape recorder to augment the senses in the "search" of the tape, and challenges to the warrantless playing of the tape as a First Amendment violation of protected speech.
 
 
 49
 The Tenth Circuit reached a similar conclusion in United States v. Reyes, 798 F.2d 380 (10th Cir. 1986). In Reyes federal agents seized a cassette tape during the execution of a warrant authorizing the seizure of "drug trafficking records, ledgers, or writings identifying cocaine customers, sources, [etc.]." Id. at 382. The defendant attacked the seizure of the cassette tape as outside the scope of the warrant. In rejecting the defendant's arguments, that court held that "in the age of modern technology and commercial availability of various forms of items, the warrant could not be expected to describe with exactitude the precise form the records would take." Id. at 383. See also United States v. Falcon, 766 F.2d 1469 (10th Cir. 1985). The Tenth Circuit in Reyes also cited with approval the Ninth Circuit's resolution of a similar issue in United States v. Gomez-Soto, 723 F.2d 649, 655 (9th cir.), cert. denied, 466 U.S. 977 (1984). There the Ninth Circuit reviewed the seizure and playing of a microcassette against a challenge that the cassette was not particularly described in the warrant and that the cassette was a "locked container" which could be opened only by playing it on a tape player. The warrant in Gomez authorized the search and seizure of, among other things, books, papers, records, and documents. The Court noted that:
 
 
 50
 A microcassette is by its very nature a device for recording information in general whether it be statistical information, conversations, past events, future plans, all of which come clearly within the specific authority of the warrant. The failure of the warrant to anticipate the precise container in which the material sought might be found is not fatal.
 
 
 51
 With these authorities in mind we turn now to the Secret Service agent's review of the "Carol" and "Becky" cassette tapes challenged in this case. We find no error in the seizure and subsequent playing of either the "Carol" or the "Becky" tapes. The agents' knowledge of the connection of Carol with DeBardeleben's 1976 counterfeiting activities justified both the seizure of the "Carol" tape under the warrant and its playing for evidence of the plant location. The evidence of sexual activity which appeared to be nonconsensual on the woman's part contained on the "Carol" tape and the references contained in DeBardeleben's personal notes regarding sexual abuse of women established probable cause for the playing of the "Becky" tape.
 
 III.
 VINDICTIVE PROSECUTION
 
 52
 DeBardeleben contends that the government engaged in vindictive prosecutions of him to prevent him from exercising his constitutional rights. This claim is based in part on the government's prosecution of him in three separate judicial districts for his counterfeiting activities in those districts, and the use at his sentencing hearing on his North Carolina counterfeiting conviction of evidence seized from the May 1983 Landmark and Manassas searches. DeBardeleben also argues that the government was attempting to force him to waive his Fourth Amendment challenges to the May 1983 searches by the use of this evidence at the North Carolina sentencing h.earing, and that the government was attempting to paint him as a "bad" person and was engaged in selective prosecution of him.
 
 
 53
 None of these, or the other, contentions advanced in support of this claim are supported by the record. These claims were not raised in a fashion below sufficient to give the district court the opportunity to develop a factual basis for them. In any event, as they are presented to us on appeal, they are without merit. The fact that DeBardeleben was prosecuted in several separate judicial districts for crimes committed in those districts does not support a claim of prosecutorial vindictiveness. There has been no showing that other persons similarly situated have not been prosecuted, or that the government's decision to prosecute him was based on some impermissible criteria such as race, religion, or political beliefs. See United States v. McWilliams, 730 F.2d 1218, 1221 (9th Cir. 1984). Nor does the mere fact that several states have charged DeBardeleben with a variety of criminal offenses committed in those jurisdictions support this claim. Each sovereign is entitled to charge perpetrators of crimes committed in their respective jurisdictions. These charging decisions are, within constitutional limits not challenged here, left to the sound discretion of that sovereign.
 
 
 54
 Furthermore, we find no support in the record for DeBardeleben's claim that the government was engaged in a conspiracy to force defendant to waive his Fourth Amendment challenges to certain evidence seized from various storage lockers. DeBardeleben was given ample opportunity to challenge this evidence below and availed himself of this opportunity.
 
 IV.
 EXCESSIVE SENTENCE
 
 55
 DeBardeleben's assignment of error relating to his sentence has not been actively pursued on appeal. DeBardeleben has merely listed the claim as an assignment of error. He alleges that the trial court considered improper material in its sentencing decision and that the resulting sentence imposed was so disproportionate and excessive as to be a violation of his Fifth, Eighth, and Fourteenth Amendment constitutional rights to due process, freedom from cruel and unusual punishment, and equal protection.
 
 
 56
 At the sentencing hearing DeBardeleben objected to that portion of the pre-sentence report concerning the outstanding detainers against him. In response to the objection the trial court stated that it would not consider the fact that DeBardeleben was wanted on other charges and would not consider charges which had not resulted in a conviction.
 
 
 57
 At the sentencing hearing the trial court stated:
 
 
 58
 It becomes my duty and responsibility at this time, Mr. De Bardeleben, to impose sentence in this case. I feel impel 'led to first address the considerations that I have in mind in imposing this sentence. First as to the nature and circumstances of the offense, it, your offense of what you are convicted here, is the most outrageous, cruel, and inhuman crime imaginable, and clearly calls for the maximum possible sentence. It is hard to imagine any crime that could be worse under the statute we're dealing with. it is not necessary for me to repeat, here, the facts of the case as they came out, both at the trial and, to some extent, at the Suppression Hearings. The -anyone who was in the Courtroom during these proceedings is well aware of the facts upon which this sentencing today is based. The nature and circumstances of the offense, also, relate directly to [the victim], and the injury to her and to her family is truly tragic.
 
 
 59
 The evidence at the Suppression Hearings indicate[s] that this was not an isolated incident, but only this incident is before me today. In addition, Mr. De Bardeleben, of course, you have a prior record of felonies for counterfeiting, and they are clearly reflected in the sentences of a hundred thirty-five years that are presently outstanding.
 
 
 60
 I have seen no sign, whatever, Mr. De Bardeleben, of remorse on your part throughout these proceedings, or indeed, today. And indeed, your statement today indicates that in some manner, the way in which you look at this, that you are the victim in this thing, and no one who sat through this trial would think that there was any victim other than (the woman].
 
 
 61
 The Court recognizes a need to protect the public from further crimes by you. The Court also needs to reflect the seriousness of this offense so that the law in this country will be respected.
 
 
 62
 * * * * *
 
 
 63
 The penalty for the crime of kidnapping is any term of years or for life. Upon first impression, it would seem reasonable to impose a sentence of life imprisonment in this case. Upon reflection, however, I have decided to impose a term of years. My decision is based upon the revisions of law set forth by the Congress in the United States [Clode. Title 18 of the United States (C]ode, Section 4205, provides that whenever a prisoner is serving more than one year in prison, he becomes eligible for release on parole after serving one third of the sentence, or sentences, imposed by the Courts. If a life sentence is imposed, or if the total of sentences imposed exceeds thirty years, then the Defendant becomes eligible for release on parole after serving ten years. I also note in the presentence probation report that the parole commission guidelines, for this crime, is 100 to 148 months, or approximately eight to twelve years. Release of this Defendant, at any time, will threaten every woman in this country. And, in addition, the damage it would do to [the victim], if she ever knew that this Defendant was once more free in this country, the damage would be incalculable. I recognize that Mr. De Bardeleben is presently under a sentence of a hundred and thirty-five years, but as [the Assistant United States Attorney] has advised the Court this morning, a hundred of those years is not final, and Mr. De Bardeleben is pursuing his rights on appeal. So, accordingly, I must sentence in this case, on the basis of this case alone, and leave, for other Courts and other circumstances, the ultimate punishment under the sentences that have heretofore been imposed on Mr. De Bardeleben. I do not know what some parole authorities in the future might be disposed to do with this Defendant, but even the possibility of this Defendant obtaining release in ten or so years, reduces the seriousness of his crime to the point of triviality.
 
 
 64
 Accordingly, I have found authorization for an appropriate sentence in subparagraph [ (b)) of Section 4205. I specifically find the ends of justice and the best interests of the public require this Defendant be sentenced to imprisonment for a term exceeding one year, and that I should designate in the sentence, a minimum term, at the expiration of which the Defendant shall become eligible for parole, which is less than one third of the maximum. It should be clear to all who review this sentence that my intent is to announce that this Defendant will not be released from prison, at any time, insofar as it is within the power of the judicial branch of the government to prevent such a release.
 
 
 65
 Accordingly, I pronounce the following sentence. Mr. De Bardeleben, I sentence you to the custody of the Attorney General of the united States or his authorized representative for a term of 180 years. I specifically order that this sentence shall run consecutive to, and not concurrent with, the sentences heretofore imposed in the Eastern District of Tennessee, the Middle District of Tennessee, and the Western District of North Carolina. Further, in accordance with Title 18, United States Code, Section 4205[ (b)(1) ], I specifically order that you shall become eligible for parole, for release on parole, only on completion of serving fifty-nine years, which is one year less than one-third of the maximum sentence of 180 years.
 
 
 66
 We have carefully examined the record for an indication that the trial judge considered improper material in imposing sentence. we find no error in the manner in which the sentence was imposed. See United States v. O'Driscoll, 761 F.2d 589 (10th Cir. 1985), cert. denied, --U.S. ----, 54 U.S.L.W. 3562 (Feb. 24, 1986).
 
 
 67
 Nor do we find the length of the sentence to be excessive or disproportionate, or otherwise in violation of DeBardeleben's constitutional rights. The penalty provided under 18 U.S.C. Sec. 1201 for kidnapping is "imprisonment for any term of years or for life." Generally a sentence that is within statutory limits is not reviewable on appeal, United States v. Tucker, 404 U.S. 443, 447 (1972); United States v. Barrow, 540 F.2d 204 (4th Cir. 1976), unless the district court judge has failed to exercise his discretion. United States v. Wilson, 450 F.2d 495, 498 (4th Cir. 1971).
 
 
 68
 The Court may also review a sentence where the sentence imposed may be so disproportionate to the crime as to constitute excessive punishment. Solem v. Helm, 463 U.S. 277 (1983). Based on the facts of this case, DeBardeleben's background and prior criminal record, his lack of remorse, and the clear need to protect the public, we hold that the district court's imposition of the 180-year sentence was not an abuse of discretion. See O'Driscoll, supra (300-year consecutive sentence for kidnapping not excessive).
 
 V.
 WAIVER OF COUNSEL
 
 69
 DeBardeleben's final argument is that he was forced into an unconstitutional choice of either accepting ineffective counsel or proceeding with no counsel at all; therefore, his waiver of his Sixth Amendment right to assistance of counsel was invalid and reversible error. Although DeBardeleben listed this claim as an assignment of error he has not actively pursued it on appeal.
 
 
 70
 This claim, as it is presented to us for review, is without merit. DeBardeleben was initially appointed counsel to represent him on this indictment. This counsel was dismissed at DeBardeleben's request and the trial court appointed a second attorney. DeBardeleben successfully moved to dismiss this attorney, as well as the one subsequently appointed. it appears that the dismissals were based in part on those attorneys' requests of DeBardeleben that he identify potential witnesses, and because these attorneys discussed the possibility of a plea bargain. DeBardeleben viewed these actions by the attorneys as against his interests. After the dismissal of the third attorney DeBardeleben requested that he be permitted to represent himself. The trial court held a hearing on DeBardeleben's motion to proceed pro se and after careful consideration granted it. We find DeBardeleben's waiver of his right to counsel to be knowingly and intelligently made, and find no error in the trial court's decision in this regard. See Faretta v. California, 422 U.S. 806 (1975) (defendant has right under Sixth Amendment to represent himself at trial).
 
 
 71
 The record also supports our conclusion that DeBardeleben knew the risks and disadvantages that he faced in representing himself. He had been a defendant in a criminal case no less than five times and had been represented by counsel in at least four of those cases. DeBardeleben's self-representation was not a case of a novice to the judicial system attempting to waive the assistance of counsel. We reject DeBardeleben's argument that he was faced with the decision of either accepting ineffective counsel or no counsel at all. To be sure, a claim of ineffective assistance of counsel could be made if defense counsel made no attempt to discover potential defense witnesses. In short, DeBardeleben must be said to have made his decision to defend himself with his "eyes open." See United States v. McDowell, 814 F.2d 245, 251 (6th Cir. 1987).
 
 VI.
 SUMMARY
 
 72
 To summarize, we hold that the searches of the Landmark and Manassas storage lockers were not outside the scope of the warrants; that the agents' seizure of the footlockers in their entirety was not unreasonable under the circumstances of this case; that the agents' seizure of those items not specifically authorized by the warrants which were later used at DeBardeleben's trial was proper under the plain view doctrine; that the seizure and subsequent playing of the "Carol" tape was authorized by the warrant and that the contents of the "Carol" tape provided probable cause under the plain view doctrine for the playing of the "Becky" tape; and the evidence seized subsequent to these searches and used at DeBardeleben's trial was not tainted by either the Landmark or Manassas searches. We hold that DeBardeleben has failed to show, based on the record before us, either that the government engaged in vindictive prosecution of him, or that the trial judge considered improper material in imposing sentence. We find no abuse of discretion in the imposition of the 180-year sentence. Finally, we find no merit in DeBardeleben's claim that his waiver of assistance of counsel at his trial was invalid.
 
 
 73
 Finding that the facts and legal arguments are adequately presented in the briefs and the record, that the decisional process would not be aided significantly by order argument, and that DeBardeleben's contentions are without merit, we dispense with oral argument pursuant to Fed.R.Civ.P. 34(a) and Local Rule 34(a). Accordingly, the judgment of conviction is affirmed.
 
 
 
 [1]
 The continued viability of this prong of the plain view exception to the warrant requirement is questionable. Justice White has noted, regarding this prong, that "this 'requirement' of the plain-view doctrine has never been accepted by a judgment supported by a majority of this Court, and I therefore do not accept the dissent's assertion that evidence seized in plain view must have been inadvertently discovered in order to satisfy the dictates of the Fourth Amendment." Arizona v. Hicks, --U.S. ----, 55 U.S.L.W. 4258, 4260 (March 3, 1987) (White, J., concurring); see also United States v. Bradshaw, 490 F.2d 1097, 1101 n.3 (4th Cir. 1974)
 
 
 [2]
 We limit our holding to the items which were seized pursuant to the warrants and under the plain view doctrine and which were actually used as evidence at defendant's trial. We express no opinion on the admissibility of items seized but not used against defendant at his trial