The appellant, David Lawrence Poole, was charged in five separate indictments with the production of obscene matter depicting persons under seventeen years of age involved in obscene acts, in violation of Ala. Code 1975, § 13A-12-197. Four of these indictments were consolidated for trial and a jury convicted the appellant on all *Page 634 
four charges. He was sentenced as an habitual offender to imprisonment for life on each of the four convictions, with the sentences to run consecutively. The appellant subsequently pleaded guilty to the fifth indictment, although he preserved his right to appeal certain issues. He was also sentenced to imprisonment for life on that conviction, with the sentence to run concurrently with the life sentence imposed on one of the jury convictions.
Two separate appeals have been filed with this Court. One appeal (CR-90-699) pertains to the four cases tried before a jury, the other (CR-90-1156) concerns the issues preserved when the appellant pleaded guilty to the fifth indictment. Because the facts and issues in these appeals are intertwined, we have elected to dispose of both appeals with one opinion.
On August 11, 1989, the Rainsville Police Department received a telephone call concerning a video camera in the men's rest room of the Rainsville Skating Rink, the appellant's place of business. Officers dispatched to the scene observed a video camera behind a vent grill in the ceiling of the men's rest room. The officers removed this camera and found that it was attached to a coaxial cable leading to the appellant's trailer, which was located some twenty feet from the skating rink. The next day, the officers obtained a search warrant for the appellant's trailer. During the search of the trailer, the officers seized a number of video cassette tapes. Four of these tapes form the basis for the indictments in cases CC-89-444, -524, -525, and -527, which were consolidated for trial. The video tape contained in the camera seized from the rest room of the skating rink is the basis of the indictment in CC-89-526, to which the appellant pleaded guilty.
 I
In both appeals, the appellant asserts that the trial court erred in denying his motion to suppress the video camera and the video tape contained therein that were seized without a warrant from the rest room of the skating rink.
It appears from the record in CR-90-699 that the camera was first seen and reported by a patron or patrons of the skating rink. Rainsville police officers were then dispatched to the skating rink. Officer Mark Hawes testified at the suppression hearing that he went into the men's rest room where he observed a video camera "up in the ceiling." R. 59 (CR-90-699). When asked to describe the location of this camera, Officer Hawes responded, "There was a vent covered by a, sort of like a grate, and the camera was up above that." Id.[1] Officer Hawes stated that he could "see the camera from just being inside the rest room looking up through that grate." Id. When the prosecutor asked, "Did you have to move anything or put anything aside in order to see that camera if you knew where you were looking," Hawes responded, "No, sir." Id. at 59-60.
The appellant maintains that he had a reasonable expectation of privacy in the skating rink rest room, and that, therefore, a warrant was required before the officers could seize the camera and the video tape that it contained. He also asserts that "[t]he fact that the camera was 'hidden' clearly demonstrates [his] expectation of privacy in its existence." Appellant's brief at 18 (CR-90-699); Appellant's brief at 23 (CR-90-1156).
It has long been recognized "that the Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as to private homes. An owner or operator of a business thus has an expectation of privacy in commercial property, which society is prepared to consider to be reasonable." New York v. Burger, 482 U.S. 691, 699,107 S.Ct. 2636, 2642, 96 L.Ed.2d 601 (1987) (citations omitted). However, "a business operator has a reasonable expectation of privacy only in those areas from which the *Page 635 public has been excluded." United States v. Dunn, 480 U.S. 294,316, 107 S.Ct. 1134, 1147, 94 L.Ed.2d 326 (1987) (Brennan, J., dissenting) (footnote omitted) (emphasis added). See Marylandv. Macon, 472 U.S. 463, 469, 105 S.Ct. 2778, 2782,86 L.Ed.2d 370 (1985) (defendant had no "reasonable expectation of privacy in areas of the store where the public was invited to enter and to transact business"); See v. City of Seattle, 387 U.S. 541,545, 87 S.Ct. 1737, 1740, 18 L.Ed.2d 943 (1967) ("administrative entry, without consent, upon the portions of commercial premises which are not open to the public may only be compelled . . . within the framework of a warrant procedure").
It is clear that the appellant in this case had no reasonable expectation of privacy in the rest room utilized by the male patrons of his skating rink. Nor is there any merit to his argument that the camera was "hidden," thereby creating an expectation of privacy in the camera. Officer Hawes' testimony at the suppression hearing clearly establishes that the camera was not "hidden." Hawes stated that he could "see the camera from just being inside the rest room looking up through that grate." R. 59 (CR-90-699). He also testified, without objection, that he had interviewed the patrons of the skating rink the night the camera was found and that "[t]he[re] had been many people that had seen [the camera] after the young man found it." Id. at 60. It is clear that, even though the camera was behind a vent grill, it was readily visible to a person standing in the rest room. Compare United States v. Irizarry,673 F.2d 554, 559 (1st Cir. 1982) (narcotics and weapon found above soundproofing panel in ceiling could not be seen by person standing on the bathroom floor).
In United States v. White, 890 F.2d 1012 (8th Cir. 1989), cert. denied, ___ U.S. ___, 110 S.Ct. 3254, 111 L.Ed.2d 763
(1990), the court noted that even a public rest room stall "does not afford complete privacy, [as] an occupant of the stall would reasonably expect to enjoy [only] such privacy as the design of the stall afforded, i.e., to the extent that defendant's activities were performed beneath a partition and could be viewed by one using the common area of the restroom, the defendant had no subjective expectation of privacy, and, even if he did, it would not be an expectation of privacy which society would recognize as reasonable." 890 F.2d at 1015
(quoting People v. Kalchik, 160 Mich. App. 40, 407 N.W.2d 627,651 (1987)). We find this observation equally applicable in the present case. The video camera, although behind a vent grill, could readily be seen by anyone in the rest room. While the appellant undoubtedly did not intend or anticipate that the camera would be observed or reported to the police, "[t]he concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities." United States v. Jacobsen, 466 U.S. 109, 122,104 S.Ct. 1652, 1661, 80 L.Ed.2d 85 (1984). "The mere expectation that the possibly illegal nature of [one's activities] will not come to the attention of the authorities, whether because a customer will not complain or because undercover police will not transact business with the store is not one that society is prepared to recognize as reasonable." Maryland v. Macon,472 U.S. at 469, 105 S.Ct. at 2782. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz v. United States,389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). By voluntarily placing the video camera in a portion of the business premises to which his patrons had ready access, the appellant "exposed" the camera to possible observation by patrons and thus assumed the risk that the camera's presence in the rest room would be reported to the police. Cf. Smith v.Maryland, 442 U.S. 735, 744, 99 S.Ct. 2577, 2582,61 L.Ed.2d 220 (1979) (by using his telephone, defendant "assumed the risk that the [telephone] company would reveal to police the numbers he dialed"); United States v. Miller, 425 U.S. 435, 443,96 S.Ct. 1619, 1624, 48 L.Ed.2d 71 (1976) (prior to the enactment of the Right to Financial Privacy Act, codified at 12 U.S.C. § 3401-3422 (1988), bank "depositor *Page 636 
t[ook] the risk, in revealing his affairs to [a bank employee] that the information w[ould] be conveyed by that person to the Government").
Therefore, we conclude that the video camera was in "plain view" and that its discovery did not involve a "search."
 "As a general proposition, it is fair to say that when a law enforcement officer is able to detect something by utilization of one or more of his senses while lawfully present at the vantage point where those senses are used, that detection does not constitute a 'search' within the meaning of the Fourth Amendment."
1 W. LaFave, Search and Seizure, § 2.2 at 320 (2d ed. 1987). "[I]f the police merely enter a rest room and see conduct occurring within a stall which is 'readily visible and accessible' to any member of the public who so enters, there is again no intrusion into a justified expectation of privacy."Id. § 2.4(c) at 440-41. "When law enforcement officers suspect that crimes are being perpetrated, they are as free to enter rest rooms as is any member of the public. Should they discover from a location open to the public the commission of criminal acts, their observation of what is in plain view involves no search, and is not subject to the strictures of the Fourth Amendment." People v. Triggs, 8 Cal.3d 884, 894 n. 7,106 Cal.Rptr. 408, 414-15 n. 7, 506 P.2d 232, 238-39 n. 7 (1973), overruled on other grounds, People v. Lilienthal, 22 Cal.3d 891,896 n. 4, 150 Cal.Rptr. 910, 912-13 n. 4, 587 P.2d 706,708-09 n. 4 (1978).
However, the fact that the camera was in plain view and lawfully observed does not automatically mean that it could be lawfully seized. 1 LaFave, § 2.2(a) at 323-25. "[P]lain viewalone is never enough to justify the warrantless seizure of evidence." Coolidge v. New Hampshire, 403 U.S. 443, 468,91 S.Ct. 2022, 2039, 29 L.Ed.2d 564 (1971) (opinion of Stewart, J.), quoted in Horton v. California, 496 U.S. 128, 136,110 S.Ct. 2301, 2307, 110 L.Ed.2d 112 (1990).
"It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. There are, moreover, two additional conditions that must be satisfied to justify the warrantless seizure. First, not only must the item be in plain view, its incriminating character must also be 'immediately apparent.' [Coolidge, 403 U.S.] at 466,91 S.Ct. at 2038; see also Arizona v. Hicks, 480 U.S. [321, 326-27,107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987)]. . . . Second, not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself.[7]
Horton, 496 U.S. at 136-37, 110 S.Ct. at 2308. Thus, four conditions must be satisfied before an object may be seized without a warrant under the plain view exception to the warrant requirement: (1) the object must be in plain view; (2) the viewing officer can not have violated the Fourth Amendment in arriving at the place from which the evidence is observed (the observation is from a place where the officer had a right to be); (3) the incriminating character of the evidence must be immediately apparent; and (4) the officer must have a lawful right of access to the object itself.[2]
In this case, the first, second, and fourth conditions were clearly met. As was discussed above, the video camera was observed *Page 637 
in a rest room open to the male patrons of the skating rink. Thus, the police officers clearly had both a right to be in the rest room where the camera was observed and a lawful right of access to the camera. It remains only for us to determine whether the third condition was met, that is, whether the incriminating character of the video camera was immediately apparent to the officers. In order to make this determination, we must first review the general legal principles applicable to obscene materials and the criminal statutes implicated by the facts of this case.
It is clear that "obscenity is not within the area of constitutionally protected speech or press," Roth v. UnitedStates, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498
(1957), and that a state may regulate "all the hard core pornography that it constitutionally [can]," Smith v. UnitedStates, 431 U.S. 291, 303, 97 S.Ct. 1756, 1765, 52 L.Ed.2d 324
(1977). The current test for determining whether material is obscene, and thus constitutionally subject to regulation, was set forth by the United States Supreme Court in Miller v.California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Under the Miller test, material is obscene if "(a) . . . 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest . . .; (b) . . . the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) . . . the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U.S. at 24,93 S.Ct. at 2615.
In New York v. Ferber, 458 U.S. 747, 102 S.Ct. 3348,73 L.Ed.2d 1113 (1982), the Supreme Court addressed the question of whether states could regulate "material depicting children engaged in sexual conduct without requiring that the material be legally obscene." 458 U.S. at 749, 102 S.Ct. at 3350-51. Expressing concern for the widespread problem child pornography has become and noting the danger for irreparable harm to the emotional, physiological, and mental well-being of the children exploited for this purpose, the Court stated that it was "persuaded that the States are entitled to greater leeway in the regulation of pornographic depictions of children."458 U.S. at 756, 102 S.Ct. at 3354.
 "The Miller standard, like all general definitions of what may be banned as obscene, does not reflect the State's particular and more compelling interest in prosecuting those who promote the sexual exploitation of children. Thus, the question under the Miller test of whether a work, taken as a whole, appeals to the prurient interest of the average person bears no connection to the issue of whether a child has been physically or psychologically harmed in the production of the work. Similarly, a sexually explicit depiction need not be 'patently offensive' in order to have required the sexual exploitation of a child for its production. In addition, work which, taken on the whole, contains serious literary, artistic, political, or scientific value may nevertheless embody the hardest core of child pornography. 'It is irrelevant to the child [who has been abused] whether or not the material . . . has a literary, artistic, political or social value.' We therefore cannot conclude that the Miller standard is a satisfactory solution to the child pornography problem."
Ferber, 458 U.S. at 761, 102 S.Ct. at 3356-57 (citation and footnote omitted). The Court then created a separate test for child pornography by "adjust[ing]" the Miller test "in the following respects: A trier of fact need not find that the material appeals to the prurient interest of the average person; it is not required that the sexual conduct portrayed be done so in a patently offensive manner; and the material at issue need not be considered as a whole." Ferber,458 U.S. at 764, 102 S.Ct. at 3358.
In 1978, four years before the decision in Ferber, the Alabama Legislature passed a child pornography act. Act No. 592, 1978 Ala. Acts 705 (codified at Ala. Code 1975, §§13A-12-190 through 13A-12-198 (1982 Replacement Vol.)). Among other things, this act made it illegal to knowingly produce by any means "obscene matter displaying or depicting in any way a person *Page 638 
under the age of 17 years engaged in or involved in any way in any obscene act" involving certain specified sexual conduct.[3] § 8, 1978 Ala. Acts at 708-09 (codified at Ala. Code 1975, §13A-12-197 (1982 Replacement Vol.)) (emphasis added). The term "obscene" was defined in § 1(1) of the Act (codified at §13A-12-190(12) (1982 Replacement Vol.)) as follows:
 "[W]hen used to describe any act or matter which contains a depiction of an act [involving certain specified sexual conduct], [such term] means such an act or matter which:
 "(i) Applying contemporary local community standards, on the whole, appeals to the prurient interest; and
"(ii) Is patently offensive; and
 "(iii) On the whole, lacks serious literary, artistic, political or scientific value."
By its terms, this legislation required both the act of sexual conduct in which the child was engaged and the depiction of that act to be "obscene" under the Miller test. Two years after Ferber was decided, the legislature passed a second child pornography act, the avowed purpose of which was "[t]o amend Code of Alabama 1975, §§ 13A-12-190 through 13A-12-197, relating to child pornography, in order to further define and prohibit child pornography and to further provide for the trial of cases involving it. . . ." Act No. 84-285, 1984 Ala. Acts 492 (codified at Ala. Code 1975, §§ 13A-12-190 through13A-12-198 (Supp. 1990)). Section 8 of the 1984 Act (codified at § 13A-12-197 (Supp. 1990) provides that it is a criminal offense to knowingly produce by any means "obscene matter that contains a visual reproduction of a person under the age of 17 years engaged in any act" involving certain specified sexual conduct. (Emphasis added.)
There are two major differences in this section and former § 13A-12-197. The first is that new § 13A-12-197 does not require that the act engaged in by the child be obscene. The second difference is that "nudity," one of the six acts of sexual conduct specified in former § 13A-12-197, has been divided into the separate categories of "breast nudity" and "genital nudity." Thus, there are seven acts of sexual conduct specified in new § 13A-12-197. The most significant change effected by the 1984 Act, however, appears in § 1(13) (codified at § 13A-12-190(13) (Supp. 1990)) which provides a new two-part definition for the term "obscene:"
 "(a) When used to describe any matter that contains a visual reproduction of breast nudity, such term means matter that:
 "1. Applying contemporary local community standards, on the whole, appeals to the prurient interest; and
"2. Is patently offensive; and
 "3. On the whole, lacks serious literary, artistic, political or scientific value.
 "(b) When used to describe matter that contains a visual reproduction of an act [involving one of the other six forms of sexual conduct], such term means matter containing such a visual reproduction that itself lacks serious literary, artistic, political, or scientific value."
Although new § 13A-12-197 specifically proscribes the production of "obscene matter," it is clear from new §13A-12-190(13) that the term "obscene" is not intended to invoke the automatic application of the Miller obscenity test. Only where the production of matter containing a visual reproduction of a child engaged in breast nudity is involved is the Miller test applicable. § 13A-12-190(13)a. The Miller test is not applicable to matter containing a visual reproduction of a child engaged in any of the other forms of sexual conduct specified in new § 13A-12-197. Under new § 13A-12-190(13)b, material depicting children engaged in acts involving these forms of sexual conduct need only lack "serious literary, artistic, political, or scientific value" to come within the ambit *Page 639 
of new § 13A-12-197.[4] Unlike materials depicting breast nudity, there is no requirement that these materials either "appeal to the prurient interest" or be "patently offensive." "Obscene," as applied to these materials, simply does not mean "obscene under the Miller test."
With this background on child pornography in mind, we now return to the determination of whether the third condition required to justify the seizure of an object in plain view was met. The specific question we must answer is whether the incriminating character of the video camera involved was immediately apparent to the officers.
 "The phrase 'immediately apparent' does not 'imply that an unduly high degree of certainty as to the incriminatory character of the evidence is necessary for an application of the "plain view" doctrine.' Texas v. Brown, 460 U.S. [730,] at 741, 103 S.Ct. [1535,] at 1543[, 75 L.Ed.2d 502 (1983)]. It does not mean that an officer must 'be possessed of near certainty as to the seizable nature of the items.' Id. Rather, the character of the property must be such as to give the officer probable cause to associate the property with criminal activity."
Williams v. State, 527 So.2d 764, 770 (Ala.Cr.App. 1987) (emphasis added). Probable cause "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband . . . or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required."Texas v. Brown, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543,75 L.Ed.2d 502 (1983) (citations omitted).
A video camera, in and of itself, is not likely to be immediately recognizable as evidence of a crime. See Bynum v.United States, 386 A.2d 684, 687 (D.C.App. 1978) (tape recorder found during the execution of a search warrant for specific items taken in a recent burglary was illegally seized because it was not listed on the warrant and was not immediately recognizable as evidence of a crime); State v. Holman,109 Idaho 382, 707 P.2d 493, 500 (App. 1985) (seizure of calculator during execution of a warrant invalid because "[n]o connection to any crime was immediately apparent"). However, police "officers [are] allowed to consider the evidentiary value of the items in the context in which they [are] seized." UnitedStates v. Callabrass, 607 F.2d 559, 564 (2d Cir. 1979), cert. denied, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980). "Items which ordinarily appear perfectly innocent may take on an incriminating coloration in another context." State v.Holtz, 300 N.W.2d 888, 892 (Iowa 1981).
In this case, the video camera was observed in the men's rest room of the appellant's skating rink. Although it was clearlynot hidden from sight, it was placed behind a vent grill in an obvious attempt to disguise its presence. Officer Hawes testified at the suppression hearing that the camera was pointed "in the area of the toilet." R. 108 (CR-90-699). There is also evidence that Officer Hawes, at least, was aware that the skating rink was "patronized primarily by children under the age of 17 years." CR. 11 (CR-90-699) (see Part II below).
Under these circumstances, we are of the opinion that the incriminating character of the video camera was immediately apparent *Page 640 
to the officers. As discussed at length above, new § 13A-12-197
provides that it is a criminal offense to knowingly produce matter depicting a child engaged in certain forms of sexual conduct. One of the specified forms of sexual conduct is "genital nudity," which is defined in new § 13A-12-190(11) as "[t]he lewd showing of the genitals or pubic area."[5] Matter depicting a child engaged in genital nudity falls within the class of materials to which the new § 13A-12-190(13)b, non-Miller test definition of "obscene" applies; that is, the production of such matter is proscribed where the matter merely lacks "serious literary, artistic, political, or scientific value."
A "lewd showing of the genitals" does not require any overt act by the child depicted. The child depicted is not required to have assumed a sexually inviting manner, see United Statesv. Wiegand, 812 F.2d 1239, 1244 (9th Cir.), cert. denied,484 U.S. 856, 108 S.Ct. 164, 98 L.Ed.2d 118 (1987), nor is it required that the child even be aware that the depiction is being produced, see United States v. Wolf, 890 F.2d 241, 243
(10th Cir. 1989) (child was asleep when photographs were taken). "Lewdness," within "the context of the statute applied to the conduct of children, . . . is not a characteristic of the childphotographed but of the exhibition which the photographer setsup for an audience that consists of himself or likemindedpedophiles. . . . The picture of a child 'engaged in [genital nudity]' within the meaning of [new § 13A-12-197] as defined by [new § 13A-12-190(11)] is a picture of a child's sex organs displayed [lewdly] — that is, so represented by the photographer as to arouse or satisfy the sexual cravings of a voyeur." Wiegand, 812 F.2d at 1244, quoted in Wolf, 890 F.2d at 245.
The facts that the video camera was located in the men's rest room and that it was aimed at the toilet clearly provide a reasonable basis for believing that the camera was being used to film male patrons who would have their genitals exposed while urinating in the toilet. In view of the additional facts (1) that the patrons of the skating rink were predominantly children; (2) that the camera was installed or positioned in what we can only characterize as a furtive and clandestine manner; and (3) that a "lewd showing of the genitals" depends, not on any overt act by the child involved, but on the presentation of the child-subject by the producer, we are of the opinion that the officers could have reasonably believed that the video camera was, in fact, evidence of the production of material depicting children engaged in genital nudity. We also believe that the circumstances of this case give rise to the reasonable inference that any such material being produced lacked serious literary, artistic, political or scientific value, although that would have ultimately become a question of fact for the jury.
Because the video camera, the incriminating character of which was immediately apparent, was observed in plain view by officers who were legitimately within a rest room open to patrons of appellant's skating rink, the camera and the tape it contained were validly seized under the plain view exception to the warrant requirement. Consequently, there was no error in the trial court's refusal to suppress these items.
 II
In the appeal of CC-89-444, -534, 525, and -527 (CR-90-699), the appellant argues that there was no probable cause to support the issuance of the search warrant for his trailer. *Page 641 
" 'For a search warrant to be sufficient and satisfy the constitutional requirement of probable cause, the affidavit upon which it is based must state specific facts and circumstances which support a finding of probable cause.'Carter v. State, 405 So.2d 957, 959 (Ala.Cr.App.), cert. denied, 405 So.2d 962 (Ala. 1981)." Callahan v. State,557 So.2d 1292, 1304 (Ala.Cr.App.), affirmed, 557 So.2d 1311 (Ala. 1989), cert. denied, ___ U.S. ___, 111 S.Ct. 216, 112 L.Ed.2d 176
(1990). "Probable cause to search a residence exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' Illinois v. Gates, 462 U.S. [213] at 238, 103 S.Ct. [2317] at 2332[,76 L.Ed.2d 527 (1983)]." United States v. Jenkins, 901 F.2d 1075, 1080
(11th Cir.), cert. denied, ___ U.S. ___, 111 S.Ct. 259,112 L.Ed.2d 216 (1990). As we noted in Part I, there is no requirement of a "showing that such a belief be correct or more likely true than false. A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." Texas v. Brown, 460 U.S. at 742, 103 S.Ct. at 1543. Additionally, "[w]here a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical rather than a commonsense manner, and should resolve doubtful or marginal cases according to the preference to be accorded to warrants." Maddox v.State, 502 So.2d 779, 785 (Ala.Cr.App. 1985), affirmed in part, remanded on other grounds, 502 So.2d 786 (Ala.), cert. denied,479 U.S. 932, 107 S.Ct. 404, 93 L.Ed.2d 357 (1986).
As best as this Court can decipher the handwritten affidavit supporting the warrant, it recites that the affiant, Officer Mark Hawes,
 "is a police officer for the City of Rainsville, Alabama and that he has probable cause to believe and does believe that certain items used for the production of obscene matter involving children under the age of seventeen years, to wit, video recorder and video tapes, are located in a skating rink building and house trailer adjacent to said skating rink in the possession of David Poole and located as follows: at # 189 McCurdy Avenue South, in the City of Rainsville, DeKalb County, Alabama, said probable cause based upon the following: On the night of August 11, 1989, the aforementioned skating rink was open for business and patrons of the rink reported to the Police Department that a camera had been observed by them in the men's rest room of the rink. Affiant and other officers went to the rink and observed a video camera hidden in the ceiling of the men's rest room and affiant further observed a coaxial cable leading from said camera to the aforementioned house trailer. Affiant further states that he has observed the patrons of said skating rink for several years and it is patronized primarily by children under the age of 17 years." CR. 11 (CR-90-699).
At the suppression hearing, Officer Hawes testified that in addition to the information in the affidavit, he informed District Judge Traylor, who issued the warrant, that he "was aware that Mr. Poole [the appellant] had prior convictions, sexual misconduct convictions, in Tennessee involving minor children and also that the trailer was adjacent to the skating rink." R. 64 (CR-90-699). He acknowledged on cross-examination that he did not inform Judge Traylor of the details or dates of these convictions and that he did not know the details or dates thereof. Id. at 70.
In this state, oral testimony may be used to supplement an affidavit. See Crittenden v. State, 476 So.2d 632, 634
(Ala. 1985). With the combination of the affidavit and Officer Hawes' testimony, the judge who issued the search warrant had the following information before him: During the business hours of a skating rink whose clientele was primarily children, a video camera was discovered in the men's rest room; this video camera was connected to a coaxial cable that lead to the appellant's adjacent trailer; and the appellant was a convicted pedophile.
"A person's prior convictions for similar criminal acts may be considered for purposes of establishing probable cause" although the "probative value of . . . long *Page 642 
past acts" may be weak. Howard v. Vandiver, 731 F. Supp. 1290,1297 (N.D. Miss. 1990). Officer Hawes did not know the dates or details of the appellant's prior convictions and therefore could not have provided the issuing judge with this information. Nevertheless, applying the principles set out above, we are of the opinion that the information before the issuing judge was sufficient, although only minimally so, to establish probable cause to issue the search warrant for the appellant's trailer. Cf. United States v. Anderson,933 F.2d 612, 614 (8th Cir. 1991) (probable cause for issuance of warrant to search defendant's home for drugs existed where information in the affidavit included the fact that, some three years previously, "trace amounts of drugs and drug paraphernalia had been found in [the defendant's] home").
 III
The appellant maintains in both appeals that the officers were required to obtain a warrant to view the video tapes which form the basis of the indictments against him.
With regard to the video tape contained in the video camera seized from the skating rink, we find persuasive the case ofUnited States v. Bonfiglio, 713 F.2d 932 (2d Cir. 1983). In that case, federal agents searching for a rifle pursuant to a warrant found the rifle under an attic floorboard. Found with the rifle were other firearms and a plastic bag containing "a variety of items" including "a small manilla envelope marked 'Tap on Ben Bon Hoft.' Inside this envelope [was an audio] tape cassette marked 'Ben.' " Id. at 934. The next day, without obtaining a warrant, an agent played the tape which was "a recording of a conversation between Bonfiglio and another male" in which the two were discussing the commission of various criminal acts. Id. at 935. Bonfiglio was charged with and convicted of conspiracy in connection with this tape.
In affirming Bonfiglio's conviction, the Court of Appeals for the Second Circuit held that the seizure of the envelope and the tape contained therein was proper under the plain view exception to the warrant requirement. Id. at 936. In response to Bonfiglio's argument that the agent should have obtained a warrant before playing this tape, the Court stated:
 "[W]hen items have been lawfully seized, a separate warrant is required to conduct a search thereof if the individual has a high expectation of privacy in the item seized. Here, the notation on the envelope 'Tap on Ben Bon Hoft,' under the circumstances which occurred herein, had the practical effect of putting the contents of the tape in plain view and therefore reducing the expectation of privacy." Id. at 937 (citations omitted).
We have previously determined in this case that the seizure of the video camera and the video tape contained therein was proper under the plain view exception to the warrant requirement. See Part I above. Although there was no evidence of any notation on the camera or tape, we think that the circumstances of this case, i.e., the facts that the camera was located in the men's rest room, that it was pointed toward the toilet, and that children were the predominant patrons of the skating rink, like those in Bonfiglio, "had the practical effect of putting the contents of the tape in plain view."
The appellant relies on Walter v. United States,447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), to support his argument that an additional warrant was required before the officers could view the tapes seized from his trailer. However,Walter is readily distinguished from this case.
In Walter, a shipping box containing pornographic movies was mistakenly delivered to the wrong corporate addressee. Employees of the company to which the box was wrongly delivered opened the shipping box and discovered that the individual film boxes had "suggestive drawings" on one side and "explicit descriptions of the contents" on the other. The movies were turned over to an agent of the Federal Bureau of Investigation. "Thereafter, without making any effort to obtain a warrant *Page 643 
or to communicate with the consignor or the consignee of the shipment, the FBI agents viewed the films with a projector."447 U.S. at 651-52, 100 S.Ct. at 2399. The Court concluded that "the unauthorized exhibition of the films constituted an unreasonable invasion of their owner's constitutionally protected interest in privacy. It was a search; there was no warrant; the owner had not consented; and there were no exigent circumstances." 447 U.S. at 654, 100 S.Ct. at 2400.
In this case, the tapes seized from the appellant's trailer were seized pursuant to a search warrant that authorized a search for "video tapes regarding obscene matter relating to children under the age of 17 years." CR. 11 (CR-90-699). Walter
is simply inapplicable to this case. Cf. People v. Ewen,194 Ill. App.3d 404, 141 Ill.Dec. 433, 439, 551 N.E.2d 426, 432, appeal denied, 132 Ill.2d 549, 144 Ill.Dec. 260, 555 N.E.2d 379, cert. denied, ___ U.S. ___, 111 S.Ct. 149, 112 L.Ed.2d 115
(1990) (Walter factually distinguishable and did not require officers to obtain search warrant to inspect the contents of a manilla envelope found during consent search). A second warrant for the viewing of the seized video tapes was not required.
 IV
In the appeal of case CC-89-526 (CR-90-1156), the appellant asserts that the indictment failed to charge an offense and that, therefore, the trial court should have granted his motion to dismiss.
The indictment in CC-89-526 charges, in pertinent part, that the appellant "did knowingly video tape obscene matter that contained a visual reproduction of male persons under the age of seventeen years engaged in genital nudity in violation of Section 13A-12-197 of the Code of Alabama." CR. 8 (CR-90-1156). This indictment substantially tracks the language of Ala. Code § 13A-12-197 (Supp. 1990), which provides:
 "Any person who knowingly films, prints, records, photographs or otherwise produces any obscene matter that contains a visual reproduction of a person under the age of 17 years engaged in any act of sadomasochistic abuse, sexual intercourse, sexual excitement, masturbation, breast nudity, genital nudity, or other sexual conduct shall be guilty of a Class A felony."
As the United States Supreme Court stated in Hamling v.United States, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907,41 L.Ed.2d 590 (1974):
 "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. . . . It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.' United States v. Carll, 105 U.S. 611, 612, 26 L.Ed. 1135 (1882) [1881]."
Accord, Ex parte Allred, 393 So.2d 1030, 1032 (Ala. 1980);Copeland v. State, 456 So.2d 1150, 1151 (Ala.Cr.App. 1984). It is clear from our discussion in Part I that new § 13A-12-197
sets forth "fully, directly, and expressly, without any uncertainty or ambiguity" all the elements of the offense of producing child pornography. The indictment in CC-89-526, which tracked the language of this statute, adequately stated a criminal offense and was sufficient to inform the appellant of the crime with which he was charged.
In connection with this issue, the appellant argues that " 'genital nudity,' in and of itself is not 'obscene.' " Appellant's brief at 17 (CR-90-1156). As we discussed at length in Part I, a depiction of genital nudity under new § 13A-12-197
need not meet the Miller test for obscenity — it need only lack "serious literary, artistic, political, or scientific value." § 13A-12-190(13)b. However, even if the appellant were arguing that the genital nudity involved was not a lewd showing of the genitals *Page 644 
or that it had serious literary, artistic, political, or scientific value, he would not have been entitled to the dismissal of the indictment on these grounds. These are questions of fact for a jury. United States v. Arvin,900 F.2d 1385, 1388 (9th Cir. 1990), cert. denied, ___ U.S. ___,111 S.Ct. 672, 112 L.Ed.2d 664 (1991). Cf. United States v.Langford, 688 F.2d 1088, 1091 (7th Cir. 1982) ("[t]he question of obscenity vel non, once the constitutional threshold is satisfied, is one of fact"), cert. denied, 461 U.S. 959,103 S.Ct. 2433, 77 L.Ed.2d 1319 (1983); 67 C.J.S. Obscenity § 20 at 81 (1978) (as a general rule, "there is no need to incorporate the definition of obscenity into the indictment, and the question of standards of obscenity is a matter of proof at the trial") (footnotes omitted).
The judgments of the circuit court are affirmed.
AFFIRMED.
All Judges concur.
[1] At trial, Rainsville police sergeant Roger Byrd gave a similar description of the camera's location: "[T]here's [an] exhaust vent up in the ceiling there and it had a screen cover over it and also a part of a fan laying up in the cover and up behind it was the camera." R. 318 (CR-90-699).
[7] " 'This is simply a corollary of the familiar principle discussed above, that no amount of probable cause can justify a warrantless search or seizure absent "exigent circumstances." Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic principle that the police may not enter and make a warrantless seizure. . . .' Coolidge,403 U.S. at 468, 91 S.Ct. at 2039."
[2] Justice Stewart's opinion in Coolidge imposed the additional requirement that the discovery of the evidence be inadvertent.403 U.S. at 469, 91 S.Ct. at 2040. However, this requirement "did not command a majority" and was specifically rejected by a majority of the Supreme Court in Horton. 496 U.S. at 135,136-42, 110 S.Ct. at 2307, 2308-10.
[3] There were six forms of sexual conduct specified in the statute: sado-masochistic abuse, sexual intercourse, sexual excitement, masturbation, nudity, and other sexual conduct. Each of these was defined in § 1 of the 1978 Act (codified at §13A-12-190 (1982 Replacement Vol.)).
[4] It is clear from the portions of Ferber quoted above that the legislature could have proscribed the production of such material regardless of whether the material has serious literary, artistic, political, or scientific value. Compare,e.g., 18 U.S.C. § 2251 through 2252 (1988) (prohibiting certain activity involving "any visual depiction" of a minor engaged in sexually explicit conduct); Ariz.Rev.Stat.Ann. §13-3553 (West 1989) (proscribing the production of "any visual or print medium in which minors are engaged in sexual conduct"); La.Rev.Stat.Ann. § 14:81.1 (West Supp. 1991) (proscribing certain activity with regard to "reproducing visually any sexual performance involving a child under the age of seventeen"). However, in new § 13A-12-197, the Alabama legislature has not sought to ban the production of all
material depicting a child engaged in an act of sexual conduct — it has banned the production only of that material lacking serious literary, artistic, political or scientific value.
[5] Similarly, 18 U.S.C. § 2251 through 2253 prohibit certain activity involving visual depictions of a minor engaged in "sexually explicit conduct," which is defined in § 2256(2)(E) to include "the lascivious exhibition of the genitals or pubic area of any person." The terms "lewd" and "lascivious" are virtually interchangeable. See U.S. v. Wiegand, 812 F.2d 1239
at 1244 (9th Cir. 1987); Perry v. State, 568 So.2d 339, 342
(Ala.Cr.App. 1990). In fact, an earlier version of the federal statute used the term "lewd" instead of "lascivious" in defining this particular form of "sexually explicit conduct." See Child Protection Act of 1984, Pub.L. No. 98-292, § 5(a)(4), 98 Stat. 205. Because the federal statute on this point is so similar to our statute, we have relied heavily on federal cases in interpreting our statute.